431 So.2d 358 (1982)
STATE of Louisiana
v.
Jonathan VAUGHN.
STATE of Louisiana
v.
Edwin MONTGOMERY.
Nos. 81-KA-2606, 81-KA-2609.
Supreme Court of Louisiana.
May 17, 1982.
Dissenting Opinion June 8, 1982.
On Rehearing April 4, 1983.
Rehearing Denied May 13, 1983.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Ossie Brown, Dist. Atty., Ralph Roy, Kay Kirkpatrick, Asst. Dist. Attys., for plaintiff-appellee in both cases.
Mary Olive Pierson, of Cooper, Thompson & Pierson, Baton Rouge, for defendant-appellant in No. 81-KA-2606.
Ralph Brewer, Baton Rouge, for defendant-appellant in No. 81-KA-2609.
LANIER, Associate Justice Pro Tem.[*]
The defendants, Jonathan Vaughn and Edwin J. Montgomery, were jointly indicted for the offense of aggravated rape in violation of La.R.S. 14:42. After a trial by jury, each defendant was found guilty of forcible rape and was subsequently sentenced to *359 serve ten (10) years at hard labor with the Louisiana Department of Corrections, the first two years of each sentence to be without benefit of probation, parole or suspension of sentence.
At approximately 10:00 P.M. on November 27, 1979, the complainant in this case left her real estate office in the Parish of East Baton Rouge, Louisiana, and went to the Embers Lounge. She had several drinks at the lounge and remained there until about 1:00 A.M. She left the lounge at that time and decided to walk the three blocks back to her office and telephone her sister for a ride because she was concerned about being arrested for driving while intoxicated. In the vicinity of her office, she was picked up on the street by the defendants, whom she did not previously know, and brought to the Vel Rose Motel in Baton Rouge. At the motel Vaughn had sexual intercourse with her. Montgomery attempted to have sexual intercourse, but was unable to complete the act. The complainant maintains she was forcefully abducted into the defendants' vehicle and resisted their sexual advances but was eventually overcome by force and threats of force. The defendants maintain that the complainant entered their vehicle of her own free will and consented to having sex with them.

ASSIGNMENT OF ERROR NO. 1[1]
The defendants maintain that they were denied a trial by a jury representative of the community because of the systematic exclusion of blacks from the jury by the prosecutor through the exercise of peremptory challenges. Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); State v. Washington, 375 So.2d 1162 (La.1979); State v. Brown, 371 So.2d 751 (La.1979); State v. Bias, 354 So.2d 1330 (La.1978); State v. Trudell, 350 So.2d 658 (La.1977). During the course of the jury selection, whenever the prosecutor exercised a peremptory challenge to a prospective black juror, the defendants entered objections, and motions to quash, for mistrial and for evidentiary hearings. All of these objections and motions were overruled and denied by the trial court.
A review of the record indicates that the twelve person jury was selected from forty-two prospective jurors, thirty-three of whom were white (79%) and nine of whom were black (21%).[2] Of the thirty-three white prospective jurors questioned, fourteen were excused by peremptory challenges by the defendants (43%), two were excused by peremptory challenges by the State (6%), eight were excused by the court (24%), and nine served on the jury (27%). Of the nine black prospective jurors questioned, five were excused by peremptory challenges by the State (56%), three served on the jury (33%), and one was excused by the court (11%). The final racial composition of the jury was nine white (75%) and three black (25%). The verdict was ten to two for guilty of forcible rape, with nine whites and one black voting guilty and two blacks voting not guilty. Article I, Section 17, Louisiana Constitution of 1974.
The racial make-up of the panel of jurors questioned was 79% white and 21% black. The racial make-up of the jury that judged this case was 75% white and 25% black, essentially the same as the make-up of the total panel. The record shows 33% of the black prospective jurors questioned served on the jury and 27% of the white prospective jurors questioned served. In view of these facts, we cannot say that the defendants were denied a trial by a jury representing a fair cross-section of the community.
This assignment of error is without merit.

*360 ASSIGNMENT OF ERROR NO. 2
The defendants contend that during the voir dire, while defense counsel was questioning prospective jurors about the relative credibility that they would accord prosecution and defense witnesses and the role race would play in determining the witnesses' credibility, that the trial judge erroneously sustained the prosecutor's objection to this line of inquiry and thereby inferred that more weight should be given to State witnesses and that this constituted an improper comment on the evidence by the trial judge in violation of Article 772 of the Code of Criminal Procedure.[3]
A review of pages 88 through 92 of the voir dire transcript, attached hereto as Appendix 1, shows that counsel for the defendants questioned prospective jurors without objection on whether or not they had preconceived notions about the possibility of a white woman consenting to intercourse with two black men, and about whether they had any preconceived idea of the credibility of the white victim as opposed to the two black defendants. Apparently, in anticipation of a hypothetical question, the prosecutor objected to the defense counsel posing hypothetical questions to prospective jurors. The trial judge ruled that asking hypothetical questions during voir dire was not proper and sustained the objection. Thereafter, defense counsel proceeded to question prospective jurors concerning preconceived notions of credibility based on race.
The ruling of the trial judge was not a comment on the evidence. It was merely a declaratory ruling that hypothetical questions were not proper in voir dire. The purpose of a voir dire examination is to determine the qualifications of prospective jurors by testing their competency and impartiality. Louisiana Code of Criminal Procedure, Article 786. Hypothetical questions aimed at determining in advance a juror's opinion concerning the weight of certain evidence are inadmissible. State v. Nero, 319 So.2d 303 (La.1975); State v. Corbin, 285 So.2d 234 (La.1973). Defense counsel were not precluded from asking questions concerning racial bias and prejudice.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 3
At the trial the victim testified that while in front of her real estate office when approached by the defendants, she yelled the name "Bertell" (Bertell Cook) to make the defendants believe that she was calling to someone in the office. She further testified that after she was released by the defendants that she first informed her sister and her sister's live-in companion and subsequent husband, Bertell Cook, of the incident. The defendants testified that the victim said the name "Bertell" several times while entering their vehicle and also when going to the Vel Rose Motel.[4]
During cross-examination by defense counsel, the victim denied that her brother-in-law, Bertell Cook, was a black man. Defense counsel then asked the victim if Cook ever held himself out to be a black man and the State objected on the grounds that the race of the victim's brother-in-law was not relevant. The court sustained this objection. During the presentation of the defense portion of the trial, the defendants called a deputy clerk of court to identify and introduce into evidence the marriage certificate of the victim's sister and Bertell Cook. This document purportedly showed that the victim was a witness to the wedding, and showed the race of Bertell Cook as black. This document was offered to contradict the testimony of the victim and, thus, attack her credibility. The State objected to the offer on the grounds that this was an attempt to impeach the witnesses' *361 credibility on a collateral issue and was prohibited. The trial judge sustained the State's objection and ruled the marriage certificate inadmissible.
The defendants assert that Bertell Cook's race is relevant on the issues of consent and credibility. They urge that "A substitution of sorts could have taken place that night in the mind of" the victim, and that the defendants might have been Bertell Cook to her. They urge that since Bertell Cook was the dominant male figure in the life of the victim, that this "raised a reasonable doubt as to her credibility and as to her allegation that the two accused did not have her consent." They urge that this evidence would assist the jury "in overcoming any subconscious feeling that they may have had that it is not possible for a white woman to desire sexual intercourse with a black man..." and that it would corroborate the testimony of the defendants that the victim "had mentioned that her sister had a black husband and that she had several black friends."
When a witness has been intentionally sworn and has testified to any single fact in his examination in chief, he or she may be cross-examined upon the whole case. La. R.S. 15:280. The cross-examination, however, to be admissible in a criminal proceeding, must be relevant to a material issue. La.R.S. 15:435; State v. Stevenson, 390 So.2d 1292 (La.1980); State v. Johnson, 343 So.2d 155 (La.1977). Relevant evidence is that tending to show the commission of the offense and the intent, or tending to negative the commission of the offense and the intent. La.R.S. 15:441. The relevancy of proffered evidence depends on whether it tends to prove or disprove a material fact at issue. State v. James, 394 So.2d 1197 (La. 1981); State v. Constantine, 364 So.2d 1011 (La.1978). A trial judge's determination regarding the relevancy of evidence will not be overturned absent a clear abuse of discretion. State v. Bates, 397 So.2d 1331 (La. 1981); State v. Stramiello, 392 So.2d 425 (La.1980); State v. Alford, 384 So.2d 761 (La.1980).
The race of the victim's brother-in-law is not relevant to the issue of consent. In State v. Dawson, 392 So.2d 445 (La.1980), this court observed that "The victim's prior sexual activity with someone else had no bearing on the issue of her consent to this encounter a month later." See also State v. Jack, 285 So.2d 204 (La.1973). The defendants do not claim that the victim had sexual relations with black persons on prior occasions, but merely assert that her sister lived with a black man. Even if admissible, the sexual preferences of the sister are not imputable to the victim. The fact that the victim was apparently not biased or prejudiced against her brother-in-law does not reasonably create the inference that she consented to the defendants.
Bertell Cook's race has no bearing on the victim's credibility. Just because a person has friends or relatives of different races does not mean that such person is either truthful or not truthful. State v. Johnson, 322 So.2d 119 (La.1975). The race of Bertell Cook does not bear on the general reputation of the victim for truth (La.R.S. 15:490-491), does not show that she is biased, has an interest or has been corrupted (La.R.S. 15:492), and does not show that she has been convicted of a crime (La.R.S. 15:495).
The attempt by the defendants to contradict the victim's denial that Bertell Cook was black by way of the information contained in the marriage certificate of the victim's sister and Cook is an improper attempt to contradict on a matter which is collateral and not admissible. Witnesses may not be contradicted on matters which are not relevant to the issues of the case. La.R.S. 15:493-494; State v. Marshall, 359 So.2d 78 (La.1978); State v. Cappo, 345 So.2d 443 (La.1977); State v. Martin, 310 So.2d 544 (La.1975).
The defendant, Edwin J. Montgomery, testified on direct examination without objection from the State that he knew Bertell Cook and that Bertell Cook was a black male (transcript page 272). Thus, even if the trial judge committed error by not allowing the defendants to examine the victim *362 concerning Bertell Cook's race, this error is cured and becomes harmless when other evidence of the race of Bertell Cook was admitted without objection.[5] Louisiana Code of Criminal Procedure, Article 921; State v. Eaker, 380 So.2d 19 (La.1980); State v. Hills, 379 So.2d 740 (La.1980); State v. Murray, 375 So.2d 80 (La.1979); State v. Webb, 364 So.2d 984 (La.1978); State v. Burge, 362 So.2d 1371 (La.1978).
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 4
During the cross-examination of Dr. Hypolite T. Landry, Jr., the coroner of East Baton Rouge Parish, counsel for the defendants requested to see Dr. Landry's report. The trial judge retired the jury and defense counsel went over the report with Dr. Landry out of their presence. The report indicated that on November 28, 1979, Dr. Landry interviewed the victim. When asked the date of her last intercourse prior to the incident, the report indicated that she responded November 23, 1977. The report further indicated, among other things, that the victim was currently on birth control pills. Dr. Landry expressed some doubt about the last date of intercourse being in 1977, but indicated that this was of no significance because even if it was November 23, 1979, that this was a five day period and would not affect his examination on November 28, 1979. The trial judge ruled that the evidence of last intercourse before the incident and the use of birth control pills were irrelevant and not admissible before the jury. The trial judge's ruling is correct. State v. Dawson, supra; State v. Decuir, 364 So.2d 946 (La.1978); State v. Domangue, 350 So.2d 599 (La.1977); State v. Jack, supra. See also the Louisiana Rape Shield Law, La.R.S. 15:498.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 5
The main issue at the trial of this case was whether or not the victim consented. The defendants submitted a requested special charge to the trial judge purportedly on the issue of "consent." He declined to give it on the grounds that it was his opinion that consent as it pertained to rape cases was adequately defined in the statutes on aggravated (La.R.S. 14:42), forcible (La.R.S. 14:42.1) and simple (La.R.S. 14:43) rape, and that the word "consent" was a common word whose meaning was known to all English speaking people.
La.C.Cr.P. art. 807 provides that a requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. State v. Holmes, 388 So.2d 722 (La.1980); State v. Vincent, 387 So.2d 1097 (La.1980). Since consent was the main issue at the trial, it is our opinion that the defendants were entitled to a special requested charge on consent if it was wholly correct and did not require qualification, limitation, or explanation.
The language contained in the proposed instruction was taken from 75 C.J.S. Rape, Sections 11 and 12 at pages 473 and 474. The instruction does not include all of the language contained in Sections 11 and 12, only certain portions.[6] Section 11 under Rape in 75 C.J.S. deals with consent. The requested instruction omits reference to the distinction between consent and submission and the rule that submission to compelling force, or as a result of fear or terror is not consent. There is no reference to Section 15 under Rape in 75 C.J.S. which is referred to in Section 11 and which provides in part as follows:
"Where the act of intercourse is accomplished, after the female yields through *363 fear caused by threats of great bodily injury, there is constructive force, and the act is rape, actual physical force or actual physical resistance not being required in such cases, even where the female is capable of consenting."
Section 12 under Rape in 75 C.J.S. deals with force and resistance. The requested instruction contained only portions of paragraphs a and b of Section 12 and does not include paragraph c dealing with resistance. Under paragraph b of Section 12, the portions defining degree of force and constructive force are omitted from the requested instruction.
The requested instruction actually contains rules of law relative to consent and use of force. The requested instruction omits the law that submission to compelling force or as a result of fear or terror is not consent. This particular rule of law is pertinent to the offenses of aggravated rape and forcible rape. The requested instruction contains a general definition of force and use of force, but does not define constructive force, the degree of force necessary or what type of resistance and under what circumstances resistance is required as is included in 75 C.J.S., Rape, Section 12. The instruction, as thus composed, omits pertinent rules of law necessary to give a balanced instruction on consent and force. In view of this, it is our opinion that the requested special instruction was not wholly correct and that the trial judge did not commit error when he rejected it.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 6
The defendants contend that the State failed to prove each element of the crime of forcible rape beyond a reasonable doubt and that the jury erred in finding that there was sufficient evidence to sustain such a verdict. In addition, the defendant, Montgomery, contends that there was no evidence that he had sexual intercourse with the victim asserting that both he and the victim testified that he did not achieve penetration.
In State v. Mathews, 375 So.2d 1165 (La. 1979), a majority of this Court determined that under the United States Supreme Court case of Jackson v. Virginia, 433 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the standard of review when considering the sufficiency of the evidence to support a criminal conviction is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See also State v. Campuzano, 404 So.2d 1217 (La.1981). The crime of forcible rape is defined in La.R.S. 14:42.1 as follows:
"Forcible rape is a rape committed where the anal or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape."
The evidence most favorable to the prosecution shows the following facts: On the night in question as the victim was at the door of her office, she noticed the defendants pull up in an International Scout. She heard one of the defendants call to her and ask if she needed a ride and she replied "no, thank you." She continued trying to open the door to her office when she noticed the defendants approaching her. She then yelled "no" and started hollering the name of her brother-in-law, "Bertell." One of the defendants then took her arm and began leading her to the Scout. She begged and yelled to be let go. Then both defendants grabbed her arms and dragged her into the back of the Scout. The larger man, Montgomery, got in the back of the vehicle with her and held her down and kept his hand over her mouth. She intermittently screamed, cried, and possibly passed out during the ride in the Scout. The defendants eventually took the victim to the Vel Rose Motel. She was pulled out of the Scout and placed in a motel room where she was thrown on the bed and her clothes removed in a struggle. Montgomery got on top of the victim first, but could not achieve *364 an erection. She asked him not to hurt her because she had two children and he eventually got off. Vaughn then got on top of her and had intercourse with her. The victim then decided that the best way to save herself was to make the defendants believe that she was enjoying herself and she began playing up to them. The victim convinced the defendants to take her back to her car and, on the way there, the three talked and joked. When they reached the victim's car, Vaughn asked her how he could reach her and she gave him her business card and told him to call her. Vaughn walked her to her car and kissed her good-by. The victim then drove to her sister's home and reported the incident. Bertell Cook was present when this occurred. The victim contacted a friend in the Louisiana State Police and he advised her to report the incident immediately or not report it at all. The victim then called Detective Stanley J. Bihm of the Baton Rouge City Police at 8:25 A.M. and reported the incident. Detective Bihm contacted the Sex Crime Division of City Police and proceeded to the victim's location. When he arrived, he found the victim in a semi-hysterical state of mind. He questioned her about the incident and, as she related it, she would intermittently become hysterical and calm down. After approximately thirty minutes, the phone rang and it was the defendant, Vaughn, calling for the victim. Detective Bihm attempted to monitor the conversation by sharing the telephone receiver with the victim and writing down questions for her to ask. At Bihm's direction, the victim secured Vaughn's name, address, and telephone number. The victim asked Vaughn why he did what he did and he replied that he was sorry, that he had never done anything like that before, but that he wanted to see her again. Vaughn offered to take the victim and her children to a Pizza Hut. The victim began sobbing and Detective Bihm directed her to end the conversation. Detective Benton Odom of the Sex Crime Division arrived and both Bihm and Odom took the victim to the hospital. At the hospital, the victim was examined by Dr. Hypolite Landry, Jr. He determined that she had suffered bruises, cuts and abrasions. Dr. Landry also found tenderness throughout the victim's vagina. A crisis counselor interviewed the victim and testified that she appeared upset, shaken, and crying. The police subsequently apprehended Vaughn and Montgomery at an apartment occupied by them at the address that Vaughn gave to the victim. As the police effectuated the arrest, Vaughn maintained that the victim willingly accompanied them, but Montgomery maintained that he knew nothing of the incident.
Viewing the evidence in the light most favorable to the prosecution, the jury did not commit error by accepting the version of events submitted by the State and rejecting the version submitted by the defendants. Although Montgomery did not have sexual intercourse with the victim, the evidence does show that he aided and abetted Vaughn in the commission of the offense and was a principal to the crime as defined in La.R.S. 14:24.
This assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 7
The defendants argue that the trial court committed error by imposing inadequately reasoned and excessive sentences upon them. The defendants assert that they have no serious criminal records, were employed and have good family backgrounds and that, accordingly, the ten year sentence imposed upon each of them is excessive.
A majority of this court has held that Article I, Section 20, of the Louisiana Constitution of 1974 prohibits the imposition by law of excessive punishment, and that although a sentence imposed may be within statutory limits, it may violate a defendant's constitutional right against excessive punishment and be subject to appellate review. State v. Sepulvado, 367 So.2d 762 (La.1979). A trial judge's reasons for sentence, as required by Article 894.1 of the Code of Criminal Procedure, are an important aid when reviewing a sentence for excessiveness. However, the trial judge is given a wide discretion in the imposition of *365 sentences within statutory limits, and the sentence imposed by him should not be set aside as excessive in the absence of a manifest abuse of his discretion. State v. Prados, 404 So.2d 925 (La.1981); State v. Douglas, 389 So.2d 1263 (La.1980); State v. Spencer, 374 So.2d 1195 (La.1979).
Neither the transcripts of the sentencing procedure nor the pre-sentence investigation report have been included in the record for review. The clerk's minute entry reflects that the trial court did consider the pre-sentence investigation reports and orally assigned reasons for the sentences imposed. The minimum prison term for the offense of forcible rape is two (2) years, but the trial court may, in the exercise of its sentencing discretion, elect to imprison an offender for any term between two (2) and forty (40) years. La.R.S. 14:42.1. Because we do not have the transcript of the sentencing proceeding, we are unable to determine if the trial judge adequately complied with Article 894.1. However, where the sentence imposed is not "apparently severe" this court will not remand for compliance with that article. State v. Bowick, 403 So.2d 673 (La.1981); State v. Day, 391 So.2d 1147 (La.1980); State v. Jones, 381 So.2d 416 (La.1980). Because rape is a very serious crime and because the sentences imposed in this case are in the lower range of the maximum sentence authorized, they are not "apparently severe," and thus not excessive. State v. Roussel, 381 So.2d 796 (La.1980).
This assignment of error is without merit.

DECREE
For the reasons assigned, the convictions and sentences of the defendants are affirmed.
AFFIRMED.
BLANCHE, J., concurs and assigns reasons.
LEMMON, J., dissents and assigns reasons.
CALOGERO, J., dissents for reasons assigned by LEMMON, J.
DENNIS, J., concurs believing that assignment of error No. 3 is not reversible only because the error was harmless in the context of the case.

APPENDIX NO. 1

* * * * * *
"Q. I understand that. But you've been inwell, we all have been in situations with black and white people but that's not my question. My question is; does the knowledge that this case will have testimony in it that a while woman consented to intercourse with two black men, do you have any preconceived notion that that's not possible or your mind is not open to thatthat idea?
A. (Dunbar) It's possible, it's possible.
Q. What you're saying is you think it's possible for that to happen?
A. (Dunbar) Yeah, I know it's possible, it happened to me.
Q. Mr. Okonski?
A. (Okonski) I would feel it would be possible to happen. I've still gothave a reservation, I'd be very critical of the evidence presented, I guess is what I'm saying.
Q. Would you be more critical of the State's evidence or more critical of the defense's evidence?
A. (Okonski) The defense evidence.
Q. Would Icould I then assume from your answerand I'm not trying to harass anybody when I get into this but what I'm trying to do is get to the truth and see if you need to be on this jury. Would it be fair to say that you would give more credibility to the testimony of the victimwho, in this case, is the white womanas opposed to the testimony of the defendants, who are black males?
A. (Okonski) I don't know whether I would or not at this point.
Q. Well, then tell me
A. (Okonski) I would have a tendency to say that that might happen, that would be more likely to happen than the other way around.

*366 Q. Okay. Ms. Landry?
A. (Landry) Maybe not two of them, you know, I can understand one on one, you know. I don't know, I would think that it couldn't happen with consent.
Q. Well, it's very delicateit's very delicate for me. Let me see if I can
MR. ROY: Judge, I would like to object to going into color on a hypothet. I have noI think the number, the fact whether they are familiar with one another, they're stragers, (sic) etcetera, etcetera, etcetera, all has legitimate imput and I'm going to object to going into any further details on these hypothetical
THE COURT: I think you are getting to that point of asking
MR. ROY: She's getting into the case.
THE COURT: A hypothetical question and asking for a yea or nay and it's not proper voir dire and I sustain the objection.
MS. PIERSON: To the last question, your Honor?
THE COURT: I sustain your question (sic) about asking the jurors point-blank about that, `do you feel it's possible'.
MS. PIERSON: You sustainyou sustain the objection or I can ask the question?
THE COURT: I sustain his objection, you can't ask the question.
MR. BREWER: If your Honor please, to the Court's ruling, on behalf of the accused, Montgomerythe accused, Montgomery objects
THE COURT: Let the objection be noted.
MR. BREWER: And assigns error.
MS. PIERSON: We would also like to assign an error, your Honor.
THE COURT: All right. Let both assignments be noted.
BY MS. PIERSON:
Q. Let me go back to my original questions, maybe we got a little far afield there. And the question was, Ms. Landry, andand for the rest of you too the evidence in the case will be the victim's white and the defendants
A. (Landry) It doesn't matter if they are black or white.
Q. That's my question.
THE COURT: What was her response, I didn't get
MS. PIERSON: It doesn't matter if they are white or black.
THE COURT: All right.
BY MS. PIERSON:
Q. That's what my question is related to, not the numbers or anything like that, it's just thatdo you have a preconceived notion, because of the race of the defendant and the victim
A. (Landry) No.
Q. As to who may be telling the truth?
A. (Landry) No.
Q. And what about you, Ms. Boyd?
A. (Boyd) No.
Q. Mrs. Feltus?
A. (Feltus) No.
Q. Ms. Nelson?
A. (Nelson) No.
Q. And Mr. Cascio?
A. (Cascio) No."

* * * * * *

APPENDIX NO. 2
"§ 11 ____ Want of Consent of Female in General

"At common law and under statute rape can be committed only where the unlawful carnal knowledge of a female was had without her consent or against her will.
"At common law rape could be committed only where the unlawful carnal knowledge of a female was had without her consent or against her will; lack of consent was an essential element of the offense; and there can be no rape in the common-law sense without the element of lack of consent. Under the statutes punishing the offense, an essential element of the crime of rape is that the act was committed without the consent of the female, or, as it is otherwise expressed, against her will. The act of sexual *367 intercourse is against the female's will or without her consent when, for any cause, she is not in a position to exercise any judgment about the matter.
"Carnal knowledge of the female with her consent is not rape, provided she is above the age of consent or is capable in the eyes of the law of giving consent. Thus, mere copulation, with the woman passively acquiescent, does not constitute rape. The female must not at any time consent; her consent, given at any time prior to penetration, however reluctantly given, or if accompanied with mere verbal protests and refusals, prevents the act from being rape, provided the consent is willing and free of initial coercion. Thus, where a man takes hold of a woman against her will and she afterward consents to intercourse before the act is committed, his act is not rape. However, where the female consents, but then withdraws her consent before penetration, and the act is accomplished by force, it is rape; and where a woman offers to allow a man to have intercourse with her on certain conditions and he refuses to comply with the conditions, but accomplishes the act without her consent, he is guilty of rape.

"Submission distinguished. There is a difference between consent and submission; every consent involves submission, but it by no means follows that a mere submission involves consent; and submission to compelling force, or as a result of fear or terror, as discussed infra § 15, is not consent."
(Footnotes Omitted).
"§ 12. ____ Force and Resistance

a. In general
b. Force
c. Resistance
"a. In General
Generally force, actual or constructive, and resistance are essential elements of the crime of rape.
"In the absence of threats and fear, or of fraud or surprise, or of other circumstances which make force or resistance unnecessary or impossible, force, actual or constructive, and resistance are essential elements of the crime of rape. The very term `rape' imports not only force and violence on the part of the man but resistance on the part of the woman.
"b. Force
Force, actual or constructive, is an essential element of the crime of rape. No particular amount of force is necessary to constitute the crime, but enough force to overcome the female's resistance has been held to be indispensable, taking into consideration the relative strength of the parties and other circumstances of the case.
"The requirement that the carnal knowledge must be obtained without the female's consent or against her will implies that the intercourse must be accomplished by force. Both at common law and under the statutes force is an essential element of the crime of rape, and generally, where the female is physically and mentally able to offer resistance, force is a necessary element of the offense.

"Degree of force. No particular amount of force is necessary to constitute the crime, and the facts of each individual case determine whether force, as applied to the offense of rape, exists. Although there is authority that only enough force to accomplish the rapist's purpose is necessary, and that any, even the least, force is sufficient, there is also authority that the force and violence necessary in rape is naturally a relative term, depending on the age, size, and strength of the parties, and their relation to each other. Enough force to overcome the female's resistance has been held to be indispensable, taking into consideration the relative strength of the parties and other circumstances of the case, such as outcries and the giving of alarm; and the required force is that by which the dissenting female is subjected to and put under the power of the assailant so that he is able, notwithstanding her opposition, to have sexual intercourse with her. If the carnal intercourse is obtained by *368 milder means it is not rape. However, it is not essential that the rapist kill his victim or beat her into insensibility to accomplish his purpose; and it is not necessary that the force should be such as to create a reasonable apprehension of death or bodily harm as to overpower her will; rather it is sufficient if the act is accomplished with sufficient force as to be against the woman's consent.

"Constructive force. The force necessary to constitute rape need not be actual, but may be constructive or implied. When the female does not consent, the law implies force. The mere force of penetration is sufficient where there is no resistance because of incapacity."
(Footnotes Omitted).
BLANCHE, Justice (concurring).
I conclude that a review of the available record in this case "clearly illumines" the sentencing choice. State v. Martin, 400 So.2d 1063 (La.1981). Accordingly, I concur in the affirmance of defendant's sentences.
LEMMON, Justice, dissenting.
The entire case depended upon whether the jury believed the victim's version or the defendants' version. In asserting their sole defense of consent, defendants contended that the victim told them that she had an affection for black men and that her sister dated one. When the victim, on cross-examination, denied this statement and denied that her sister's husband is a black man, the issue of the sister's husband's race became so relevant to the credibility determination that defendants were not only entitled to ask the question, but also to challenge the victim's answer. The trial court erred in concluding otherwise.
I cannot say that the excluded evidence would not have changed the 10 to 2 verdict.[1] I would therefore reverse and afford defendants a new trial before a jury which has the benefit of all evidence that bears on the probability of consent by the victim.

ON REHEARING
LEMMON, Justice.
This court granted a rehearing to decide whether the trial court erred in preventing the defendants, who were charged with aggravated rape, from offering extrinsic evidence to impeach the accusing witness' testimony during cross-examination regarding the race of her brother-in-law.[1] Because the trial court has broad discretion to decide whether to permit the cross-examiner to challenge extrinsically the witness' answer, and because the independent relevancy of this particular evidence (as opposed to its tendency merely to discredit the witness) presents a unique factual problem, it is essential to recognize the setting under which the trial court decided to exclude the evidence. To do so, it is important to focus not only on the evidence presented by the parties, but also on the defendants' theory of the case.
Testimony of the Parties
Ms. Smith (a fictitious name), defendants' accuser, testified that she drove to the Embers Lounge for a drink after leaving her real estate office, where she had completed preparations for a sale the next morning. It was already about 10:00 p.m., and she had made arrangements for her children to spend the evening with a relative and a baby-sitter. She relaxed, having three or four drinks with various other patrons at the bar, until she decided to depart for home at about 1:00 a.m. Realizing that she had drunk too much to safely operate her vehicle, she decided to summon her sister to drive her home. For reasons not entirely clear from the record, she chose not to use the telephone in the bar, but instead walked the three blocks back to her office to call from there. Leaving her automobile parked near the bar, she set out on foot. As she arrived at her office building, two *369 young men (defendants) in a vehicle pulled up and asked if she needed a ride. The versions of the subsequent events, as recounted by Ms. Smith and the two men, diverge dramatically.
There is no doubt that Ms. Smith accompanied defendants in their vehicle to a nearby motel. She testified that she was forced into defendants' vehicle and held down on the floor during the trip to the motel, where she was raped. Defendants, on the other hand, testified that Ms. Smith, after talking outside the vehicle with Vaughn for a few minutes, voluntarily entered, smoked marijuana with them, and eventually submitted willingly to intercourse at the motel.
Several hours later, defendants took Ms. Smith back to her automobile. All three agreed in testimony that she acted friendly on the return trip and gave two business cards to Vaughn, who said he would call her later (which he did), and that she kissed him good-bye before departing in her car. She explained this behavior as "role playing" in an effort to assure her safe release from the two men.
Once she was alone, Ms. Smith drove immediately to her sister's home, where she awoke her sister and Mr. Jones (a fictitious name of the man who later became her sister's husband) and reported the incident to them. After seeking further advice from a friend in law enforcement, Ms. Smith notified the police.[2]
While the investigating officer (who described Ms. Smith as very upset) was interviewing Ms. Smith at her home, Vaughn called to invite her and her children to have dinner at a local restaurant, where he was the assistant manager. During the course of the conversation, which was overheard by the officer, Vaughn revealed his identity and address. Ms. Smith testified (but Vaughn denied) that he apologized for the incident.
Later that day, Vaughn and Montgomery were arrested at their apartment. Vaughn claimed and later testified that the sexual encounter was entirely consensual and was prompted by Ms. Smith's aggressive friendliness after they offered to assist her. Montgomery at first denied being with Ms. Smith, but at trial he admitted the sexual encounter, contending that she was a willing participant.
Theory of the Defense
When one considers the testimony of the parties in the light of the theory advanced by the defense, the trial court's ruling on the evidence of the race of Ms. Smith's brother-in-law takes on complex dimensions.
Defendants (two young, single, black men who were "out on the town" for the evening) relied solely on the theory that Ms. Smith (a young, divorced, white woman) encouraged their advances and consented to sexual intercourse. Because of the sharply contrasting versions of the events, Ms. Smith's credibility or lack thereof was critical to the proffered defense of consent, a defense which defendants' counsel attempted to develop by the sworn testimony of the two defendants and by cross-examination of Ms. Smith.
Defense counsel anticipated that the jurors, despite intensive questioning on voir dire, would retain subconscious doubts that the white woman would consent to intercourse with the black men. To present the defense of consent in this interracial context, counsel attempted to emphasize Ms. Smith's relationship with Jones, whom she spontaneously described in trial testimony as the "dominant male figure" in her life at the time of the incident.
Both defendants and Ms. Smith testified that she called out Jones' name when the men stopped and asked if she needed assistance. According to defendants' testimony, she mentioned Jones again several times and informed them of her very special feeling for him, stating that he was also a black man. She also stated that she had no prejudice against blacks and had many black friends. Her inclination to display affection for these black males in her somewhat *370 intoxicated condition, the defense theorized, stemmed from her strong attachment to Jones. However, Ms. Smith expressly denied under oath that Jones was a black man or held himself out to be black, and defendants' efforts to challenge her answer were effectively blocked when the trial court sustained the prosecutor's objections to the evidence discussed in the next section.
Admissibility of the Evidence
Defendants were constitutionally entitled to offer relevant evidence in support of the defense of consent.[3] They were also constitutionally entitled to impeach the credibility of their accuser with relevant evidence.[4]
When the defense attempted to introduce evidence of Jones' race (by offering Jones' marriage license which was witnessed by Ms. Smith) to impeach Ms. Smith's testimony, the prosecutor objected on the basis that race was a collateral fact and an irrelevant matter which was not competent for use in impeaching the witness. La.R.S. 15:494. The trial judge excluded the evidence.
In view of the theory of the defense, we believe that the trial judge erred in refusing to permit defendant to prove that Jones represented himself to be black.[5]The evidence was certainly relevant to the defense theory.[6] Moreover, the fact that Jones held himself out to be a black man was a very simple matter which could have been easily established and would not have consumed an undue amount of time.[7] Most significantly, the fact of his race posed no danger of prejudice to the prosecution.
When "prejudice" to the prosecution is balanced against defendant's constitutional right to present relevant evidence in support of his defense, the balance should be weighed in favor of admissibility in those cases in which the prejudice is minimal. In this case, the fact that Ms. Smith's sister was married to a black man simply was not "prejudicial" to the prosecution. Compare State v. Ludwig, 423 So.2d 1073 (La.1982).
Furthermore, after Ms. Smith denied the relevant assertion that Jones was a black man, the proffered evidence tended to undermine her credibility, which was crucial to the prosecution's case. And the evidence *371 assumed even greater importance to the defense because the prosecutor had failed to produce Jones and Ms. Smith's sister (who were the first persons to whom the rape was reported) to testify as to her condition after the incident, relying instead solely on the testimony of the investigating officer.
The trial judge should be accorded much discretion in deciding whether to allow the cross-examiner to challenge the answer given by the witness with extrinsic evidence designed solely to reveal the falsity of the response and hence to discredit the witness. Certainly, insofar as the matter is "irrelevant" or "collateral", R.S. 15:494 prohibits impeachment. However, because of the unique circumstances presented here, the issue of Jones' race was not "collateral", and defendants therefore were entitled not only to ask the question, but also to challenge (with extrinsic evidence) the answer.
We therefore conclude that the trial judge should have exercised his discretion in favor of admissibility of the evidence, which (1) tended to prove a fact that was relevant and probative of the defense theory (but that had little prejudicial effect upon the prosecution's theory) and (2) was so inextricably tied to Ms. Smith's credibility that it bore significantly on the determination of whether Ms. Smith's version was accurate and truthful.
Doubtless, conscientious trial judges have difficulty making quick decisions on complex issues presented during a trial, and the "hindsight" of an appellate court's review of a full record may more clearly reveal the significance of an issue. For this reason, appellate courts accord great deference to the decisions of trial judges. Nevertheless, when a reviewing court concludes on a review of the record that the trial court improperly prevented a defendant from offering evidence which is critical to the theory of his case, we must reverse because the error is not harmless beyond a reasonable doubt.[8]State v. Gibson, 391 So.2d 421 (La. 1980).
Accordingly, the convictions and sentences are set aside, and the case is remanded for a new trial.[9]
MARCUS, J., dissents.
WATSON, J., dissents, believing that the evidence excluded was neither relevant nor material.
BLANCHE, Justice (dissenting).
I respectfully dissent. Although I agree that the trial judge erred by disallowing the impeachment evidence in this case, I do not believe that the error was reversible. The fact that Jones may have been a black man was brought to the jury's attention during the direct examination of the defendant, Edwin Montgomery.
NOTES
[*] Judge Walter I. Lanier, Jr. of the Court of Appeal, First Circuit and Judges Fred S. Bowes and Nestor L. Currault, Jr. of the Court of Appeal, Fifth Circuit, participated in this decision as Associate Justices pro tempore, joined by Associate Justices Calogero, Dennis, Blanche and Lemmon.
[1] The defendants each filed assignments of error, the individual and total numbers of which do not correspond. All of the defendants' various assignments of error can be placed in seven basic assignments which have been renumbered by this court and will be considered in the order in which they occurred at the trial.
[2] In their supplemental brief, the defendants state that they are unable to determine if juror, Spring, was either white or black. The record reflects that during the voir dire, the defendants did not object to the peremptory challenge to Spring and did not claim that she was black at that time. See page 130 of voir dire transcript. For these reasons, we will assume that Spring is white for purposes of this assignment of error.
[3] Article 772 of the Code of Criminal Procedure provides:

"The judge in the presence of the jury shall not comment upon the facts of the case, either by commenting upon or recapitulating the evidence, repeating the testimony of any witness, or giving an opinion as to what has been proved, not proved, or refuted."
[4] Neither Bertell Cook nor the victim's sister testified at the trial. Apparently, they were out of town on vacation and were not served with subpoenas.
[5] Even though evidence of Bertell Cook's race was introduced at the trial, counsel for the defendants did not argue any inferences to be drawn from this fact before the jury in their closing arguments.
[6] Attached to this opinion is Appendix No. 2 which is comprised of Section 11 in its entirety and Section 12, paragraphs a and b in their entirety. The italicized portions of the appendix are those parts omitted from the requested instruction. That portion in regular print is that which was included in the requested instruction.
[1] One defendant testified that the husband is black, but admission of that evidence did not cure the error in excluding evidence on this issue by independent witnesses.
[1] Defendants were convicted of forcible rape by a 10-2 verdict and sentenced to ten years imprisonment at hard labor. On original hearing, this court affirmed the conviction and sentence.
[2] A medical examination of Ms. Smith revealed "tenderness" in the vaginal area, which is not normally found after consensual intercourse by a female who has previously borne children.
[3] The right to offer relevant and nonprivileged evidence in one's defense of a criminal charge is protected by both the Sixth Amendment and La.Const. Art. I, § 16 (1974). See Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).
[4] See Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The right to cross-examine and to impeach is an indispensable aspect of the right protected by the Sixth Amendment and La.Const. Art. I, § 16 (1974). See State v. Toledano, 391 So.2d 817 (La.1980); State v. Hillard, 398 So.2d 1057 (La.1981). See also State v. Dawson, 392 So.2d 445 (La.1980).
[5] The trial judge had earlier curtailed further cross-examination of Ms. Smith on the question of Jones' race, but had stated that he would allow the defense to establish Jones' race by "legal evidence". When the judge later excluded the marriage license, he did so on the basis that Ms. Smith's signature on the license as a witness to the marriage did not necessarily establish her knowledge of the contents of the license. However, the license was properly offered as evidence of the fact that Jones held himself out as being black, and evidence of that fact was relevant to the theory of the defense.
[6] Relevant evidence is defined by the Federal Rules of Evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. See also James, Relevancy, Probability and the Law, 29 Calif.L.Rev. 689 (1941). For a scholarly discussion of the concept of relevancy in Louisiana, see State v. Ludwig, 423 So.2d 1073 (La.1982).
[7] Traditionally, even relevant evidence can be excluded, in the discretion of the court, if its admission would result in "undue delay" or would "confuse the issue" or "mislead the jury". See Fed.R.Evid. 403; McCormick, Evidence, 2d Ed. § 185 (1972), State v. Ludwig, above.

We also note that the method used by the defense was a very effective means of presenting the evidence, since the prosecutor called neither Ms. Smith's sister nor her husband (Mr. Jones) to testify as to her appearance immediately after her arrival at her sister's home. Jones and his wife (as was revealed during the trial in response to defense inquiries) left on a vacation shortly before the trial commenced and were not scheduled to return until sometime after trial.
[8] The test for deciding whether there is reversible error when the trial court erroneously refuses to admit defense evidence is not whether the evidence "would probably have changed the verdict", as in the case of a motion for a new trial based on newly discovered evidence. See La.C.Cr.P. Art. 851(3). Rather, the appellate court, when reviewing an erroneous ruling that improperly excludes evidence, must be convinced that the excluded evidence would not have affected the jury's determination. See State v. Gibson, above; La.C.Cr.P. Art. 920.

In the present case, we cannot with any certainty determine what effect this evidence would have had on the jury, either by undermining Ms. Smith's credibility or by supporting affirmatively defendants' theory of consent, or both. Because the jury returned a nonunanimous verdict convicting defendants of a lesser offense (forcible rape), it is particularly inappropriate for us to speculate that the evidence (which directly contradicted the accuser's testimony on a relevant issue) would not have affected the jury's determination.
[9] Defendants also contend that the evidence was insufficient to support a conviction, thereby precluding retrial. However, the fact that defendants and Ms. Smith were total strangers, as well as the evidence that she reported the incident immediately and was hysterical during the ensuing interview, support the jury's acceptance of Ms. Smith's credibility. But for the fact that the excluded evidence, which was critical to the defense, never got before the jury, we could not overturn the jury's credibility determination.