444 So.2d 273 (1983)
STATE of Louisiana
v.
Melvin STERLING.
No. 83 KA 0639.
Court of Appeal of Louisiana, First Circuit.
December 22, 1983.
*275 Ossie Brown, Dist. Atty., Joseph N. Lotwick, Asst. Dist. Atty., Baton Rouge, for plaintiff-appellee.
Paula Cobb, Baton Rouge, for defendant-appellant.
Before SHORTESS, LANIER and CRAIN, JJ.
LANIER, Judge.
The defendant, Melvin Sterling, was charged with armed robbery in violation of La.R.S. 14:64. Sterling filed a motion to suppress an inculpatory statement he gave to police officers alleging that the statement was the product of an illegal arrest. The trial judge denied this motion. Sterling pled not guilty and, after a trial by jury, was found guilty as charged. He was sentenced to be imprisoned at hard labor in the custody of the Louisiana Department of Corrections for a term of twenty-five years, without benefit of parole, probation or suspension of sentence, but with credit for time served. This appeal followed.

FACTS[1]
On February 16, 1982, Cindy Padgett and Patricia Canavan were robbed and murdered at the Supermat Washateria on 5537 Maplewood Drive, Baton Rouge, Louisiana. Patrick Doughty, a detective with the Baton Rouge City Police, and Eddie Stewart, an investigator for the East Baton Rouge Parish District Attorney's Office, participated in the investigation of these crimes from the time of their discovery.
On August 16, 1982, Stewart received a telephone call from a confidential informant who advised that three persons were involved in the armed robbery and murders which occurred on February 16, 1982. The informant gave the name of one of the participants and the nicknames of the other two. The informant placed a second call to Stewart and advised that the names of the participants were Melvin Sterling, Darren Kent and Keith Paul Whittaker (also referred to in the record as Keffal and "Ke" Whittaker). The informant further advised that Sterling's cousin and grandfather were aware of his involvement. After receiving these calls, Stewart conveyed this information to Doughty and Frank L. Paxio, a detective with the Baton Rouge City Police. The officers then reviewed their files on the incident and attempted to find addresses for Sterling, Kent and Whittaker.
On August 17, 1982, the officers determined that Sterling was living at his grandfather's house. Prior to noon on that date, Doughty went to the grandfather's home to find Sterling. Apparently, Sterling was not there.
Between 3:00 and 4:00 p.m. on August 17, 1982, Doughty and Stewart again went to the grandfather's home. Upon arriving, they encountered Deborah Sterling, Melvin Sterling's cousin. The officers asked Deborah Sterling if she would go "downtown" to talk about the case. Deborah Sterling declined to do so but agreed to talk to the officers in their police car. Doughty told Deborah Sterling what an accessory was and what could happen to her if she was one. Deborah Sterling was advised of her rights, signed as an advice of rights form, and the police officers then took a tape recorded statement from her. Apparently in this statement, Deborah Sterling indicated that Melvin Sterling was "outside" while the offenses were being committed.
At approximately 5:45 p.m. on August 17, 1982, Paxio and Hiller Moore, an investigator *276 with the East Baton Rouge Parish District Attorney's Office, went to Melvin Sterling's grandfather's home to talk to the grandfather and look for Sterling. Sterling arrived while the officers were talking to the grandfather. The officers advised Sterling of his Miranda rights and asked him if he would go "downtown" with them. Sterling agreed to go with the officers. Sterling was taken to Doughty's office. Doughty, in the presence of Paxio and Stewart, advised Sterling that he was not under arrest, that the officers were investigating the armed robbery and two first degree murders and that the officers wanted to talk to Sterling if he were willing. At 6:07 p.m., Doughty commenced reading the Miranda rights to Sterling from a form. Sterling signed the form at 6:12 p.m. Sterling advised the officers that all he knew about the crimes was what he saw on television. The officers discontinued the interrogation and told Sterling that he was to remain in the detective office until the officers came back. Sterling remained in this office until a second statement was taken from him at approximately 1:50 a.m. on August 18, 1982.
Apparently between the times of Sterling's first statement and second statement, the officers talked to Darren Kent (who was in jail). The record does not reflect what information, if any, Kent provided to the officers. Warrants for the arrest of Kent and Whittaker were secured. Kent was arrested in jail. Whittaker was arrested at his residence. No arrest warrant was secured for Sterling. Although the record reflects that Kent and Whittaker were arrested on the night of August 17-18, 1982, the evidence does not show what time these arrests were made.
On August 18, 1982, at approximately 1:50 a.m., Stewart and Randall Moran, an officer with the Baton Rouge City Police, commenced taking a second statement from Sterling. Stewart advised Sterling of his Miranda rights with the same form that had been earlier used by Doughty. Sterling voluntarily gave an inculpatory oral statement to the police officers which was tape recorded. Apparently after this statement, Sterling was formally arrested and booked.
EFFECT OF ILLEGAL ARREST ON SUBSEQUENT INCULPATORY STATEMENT[2]
Sterling's principal contention is that the police officers did not have probable cause to arrest him after he gave the first statement, that his second statement was a product of this unlawful arrest and that the trial judge's ruling which allowed the second statement to be introduced into evidence and presented to the jury was prejudicial error. A confession obtained through custodial interrogation after an illegal arrest must be excluded from evidence unless intervening events break the causal connection between the illegal arrest and the confession so that the confession is sufficiently an act of free will to purge the primary taint. Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); State v. Burton, 416 So.2d 73 (La.1982). The state has the burden of showing either that probable cause existed to arrest the defendant or, if the arrest was unlawful, showing that the causal connection between it and the subsequently obtained inculpatory statement was so attenuated that the confession could not properly be considered as a fruit of the illegal arrest. State v. Jackson, 424 So.2d 997 (La.1982).

FACT OF ARREST
Because Sterling contends that his inculpatory second statement was the product of an illegal arrest, we must first determine whether or not he was under arrest at the time the statement was given. The evidence reflects that Sterling voluntarily accompanied Detective Paxio and Officer Moore from his grandfather's house to the police station. Detective Doughty specifically advised Sterling that he was not under *277 arrest prior to taking the first statement. At this point in time, there was no arrest. State v. Thibodeaux, 414 So.2d 366 (La.1982); State v. Copeland, 419 So.2d 899 (La.1982).
At the motion to suppress, Doughty testified that after Sterling gave the first statement he was not allowed to go home but was "asked" to stay at the office. Paxio's testimony at the trial confirmed this. Doughty then testified that Sterling "was told after his statement to remain there until we came back." Doughty gave the following reasons for holding Sterling after the first statement:
Q Do youjust one moment. So you kept Mr. Sterling at the police station after the first statement with no grounds for holding him?
A No, ma'am, we kept him for two reasons in my mind. One, the individuals that he had given this information on we wanted to locate them and verify and keep him off the street so they couldn't get to him before we could get to them. Because one of the reasons is you don't want to lose your witness in a case of that importance. And, two, when we contacted them and if we could get a statement from them to verify if what he was telling us was actually the truth ...
In State v. Ruffin, 434 So.2d 1246, 1248 (La.App. 1st Cir.1983), appears the following:
An arrest is defined in La.C.Cr.P. art. 201 as follows:
Arrest is the taking of one person into custody by another. To constitute arrest there must be an actual restraint of the person. The restraint may be imposed by force or may result from the submission of the person arrested to the custody of the one arresting him.
An arrest occurs when circumstances indicate an intent to effect an extended restraint on the liberty of an accused, rather than at the precise time an officer tells an accused he is under arrest. State v. Commodore, 418 So.2d 1330 (La. 1982); State v. Wichers, 392 So.2d 419 (La.1980).
The trial judge ruled as a fact that "the detainment of the accused herein did constitute an arrest." This ruling is correct. Cf. State v. Bourgeois, 388 So.2d 359 (La. 1980); State v. Morvant, 384 So.2d 765 (La.1980).

PROBABLE CAUSE TO ARREST
Sterling was arrested without a warrant. In Ruffin, 434 So.2d at 1249 appears the following:
A peace officer may lawfully arrest a person without a warrant when he has reasonable (probable) cause to believe that the person to be arrested has committed an offense. La.C.Cr.P. art. 213. Probable cause to arrest exists when facts and circumstances within the arresting officer's knowledge and of which he has reasonable and trustworthy information are sufficient to justify a man of average caution in the belief that the person to be arrested has committed or is committing an offense. Although mere suspicion cannot justify an arrest, the officer does not need sufficient proof to convict. State v. Bell, 395 So.2d 805 (La.1981). Probable cause must be judged by the probabilities and practical considerations of everyday life on which average men, and particularly average police officers, can be expected to act....
Probable cause can be based on knowledge supplied to an officer by another person, even if the identity of the informant is kept confidential. Morvant, 384 So.2d at 768. The test used to ascertain the credibility of a confidential informant who provides facts to support probable cause to make a warrantless arrest is the same as that used to determine the credibility of information derived from a confidential informant which is contained in a search warrant. State v. Edwards, 406 So.2d 1331 (La.1981). (Footnote omitted).
*278 One of the most important factors in determining if probable cause existed is satisfied when police officers know that a crime has actually been committed. In such a case, the police officers need only demonstrate probable cause to identify the person who committed the crime. State v. Crain, 409 So.2d 603 (La.1982); State v. Webb, 432 So.2d 362 (La.App. 1st Cir.1983). Both Doughty and Stewart helped investigate this matter from its beginning. They knew that Cindy Padgett and Patricia Canavan had been shot, killed and robbed on February 16, 1982, in Baton Rouge, Louisiana.
Stewart received a tip from a confidential informant that Sterling, Kent and Whittaker were involved in the crimes and that Sterling's cousin and grandfather were aware of his involvement. In Illinois v. Gates, ___ U.S. ___, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the United States Supreme Court adopted a "totality of the circumstances" test for evaluating the information provided by confidential informants to determine if probable cause exists. This analysis requires a balanced assessment of the relative weights of all of the various indicia of reliability (and unreliability) attendant to an informant's tip. Important factors in evaluating the information supplied by the informant are his "veracity" and his "basis of knowledge." The "veracity" of the informant may be established by the accuracy of his prior reports and by the corroboration of his present report. The informant's "basis of knowledge" can be established either by his direct personal observation or, if the information came indirectly to the informant, the reasons in sufficient factual detail to evaluate the reliability of the indirect source and/or of the indirectly-obtained information. State v. Buckley, 426 So.2d 103 (La.1983); State v. Elliot, 407 So.2d 659 (La.1981); State v. Paciera, 290 So.2d 681 (La.1974).
The evidence of record does not show the informant's "basis of knowledge." All that was told to Stewart was that Sterling, Kent and Whittaker were involved and that Sterling's cousin and grandfather knew of his involvement. There is no evidence of record to show the accuracy of any prior reports by the informant to support his "veracity." Prior to the time that Sterling was arrested after he made his first statement, the only efforts made by the police officers to corroborate the information given by the informant was to speak with Sterling's grandfather and his cousin, Deborah Sterling. Both Doughty and Stewart testified that they did not seek a warrant for Sterling's arrest after receiving the informant's tip because they wanted to corroborate the information that he had furnished. The record does not reflect the grandfather's name or what information, if any, he provided. Thus, it is critical to the state's case that the statement given by Deborah Sterling corroborates the information furnished by the informant. However, at the motion to suppress, the state did not cross-examine Deborah Sterling nor did it introduce her tape recorded statement into evidence.
There were three persons present when Deborah Sterling's statement was taken: Doughty, Stewart and Deborah Sterling. At the motion to suppress, Doughty was not questioned by either side concerning the contents of the statement. Stewart gave the following pertinent testimony:
Q Going back to the taping of Deborah Sterling's testimony, do you remember Deborah Sterling being told that asked if she believed if she shot those two girls and she said, "No, I don't believe it." Do you remember being asked that?
A If Deborah Sterling shot the two girls?
Q No, I'm sorry. If she believed that Melvin Sterling shot those two girls and she said, "No, I don't believe it." Do you remember that?
A It was something to that effect. I don't know if that was, you know, the actual question.
Q All right. And do you remember saying, uh, the detective saying, "Yes, it happened that way. And Eddie was *279 there and we saw them." "It happened, and Eddie was there and we saw him."
A I don't remember that.
Q You don't remember that?
A No.
Q But you do remember being there for the taping of that statement from Deborah Sterling?
A Right.
Q And you do realize that I've been given the tape from that?
A Right.
Q Are you denying that that was asked or ...
A I'm not denying it. You asked me and I don't remember. You asked me if I recalled and I told you no.
Q All right.
. . . . .
Q So, Mr. Stewart, where we were we were talking about the statement given you and Detective Doughty by Deborah Sterling.
A Right.
Q In Deborah Sterling's statement to the police did she in fact say that Melvin Sterling committed the offenses that was charged?
A I don't recall. I think she did. I don't, you know, I don't know if she stated what charge but I'm pretty sure she did.
MS. COBB: Your Honor, I ask the Court's permission to play that tape to refresh Mr. Stewart's memory on the questions he asked Deborah Sterling.
MR. LOTWICK: Judge, I don't think that particular question or any of the contents of the statement that Ms. Sterling may or may not have made is material here.
THE COURT: All right, I'm going to sustain the objection.
MS. COBB: Your Honor, that statement of Deborah Sterling, according to Mr. Stewart's own testimony, was as far as I can see the basis for the holding of Mr. Sterling at the police station.
THE COURT: I'll sustain the objection at this time. You can go ahead and assign error to the Court's ruling.
MS. COBB: All right. So I would like for the record to...
THE COURT: All right, note the assignment...
MS. COBB: ... assign error.
THE COURT: ... of error and objection to the Court's ruling.
MS. COBB: All right.
Q Do you remember, Mr. Stewart, Deborah saying in that statement, "The only thing I know is that Melvin was with these two guys and he said he didn't do it and he was just with..." Do you remember her saying that?
A I think so, um-hum.
Q And do you remember that she said, uh, the detective asking, "Do you know if it was one person or two people shot?" Or, "You heard about it on the news after it happened because you told me earlier that you didn't believe it at first?" And Deborah said, "No, I don't believe it." He said, "You don't believe that Melvin shot any of those two girls?" And Deborah said, "I don't even believe it happened." Do you remember that?
A I think so, I believe she did, something to that effect, yes.
Q And do you remember in fact that Deborah Sterling was told that Melvin Sterling was involved because Detective Doughty and you were there and you saw them?
A Saw them commit the offense?
Q Um-hum.
A No.
Q You don't remember saying, uh, you don't remember the detective saying that?
A No, I don't, nothing like that, no.

*280 Q "But it happened, Eddie was there, I was there, we saw them. Melvin obviously knows it happened because..." And then said, "Well, Melvin is always telling tall tales." You don't remember that conversation on the tape?
A Not in that form.
Q Well, Mr. Stewart, this is a direct transcript from that tape that was played. Are you sure you don't remember that?
A Not, you know, not the way you're stating it, no.
The pertinent portions of the testimony of Deborah Sterling are as follows:
Q Did you think thatdid you refuse to tell them anything?
A At first I said I wasn't going to say anything. I asked them did I have to say anything and they said, "You don't have to but you will be helping Melvin if you did `cause you can prove that he was on the outside."
Q And did they say anything about arresting you or anything?
A Yes, they said if they had, you know, find out that I was lying that I could be held with withholding evidence. And then I started crying `cause I was scared, you know, maybe they could do that.
. . . . .
Q Did you know anything about, to your own knowledge, about the robbery or the...
A No, not anything.
Q I only said what I talked that little bit `cause they told me that I was helping Melvin, that's the only reason. I didn't know anything.
Q Well, when they saidwhy did you tell them that Melvin was on the outside if you didn't know?
A Because I was scared and I thought I was helping him.
In its present posture, this case is similar to State v. Scott, 355 So.2d 231 (La.1977). We are unable to conclude from the record before us that the state carried its burden of establishing the admissibility of Sterling's inculpatory second statement by either showing that probable cause existed to arrest him or, if the arrest was unlawful, if the causal connection between it and the inculpatory second statement had been broken. We reach this conclusion because, as indicated hereinafter, the best evidence of the information provided by Deborah Sterling is her taped statement which was not introduced into evidence, and the record contains no evidence of what information, if any, was provided by Melvin Sterling's grandfather. The evidence does not indicate the presence of any significant intervening circumstances between Sterling's arrest and his inculpatory second statement. However, we are unable from the record before us to determine whether "official misconduct" occurred, or, if it occurred, the "purpose and flagrancy" of the misconduct. Scott, 355 So.2d at 235-236. Cf. State v. Arceneaux, 425 So.2d 740, 743-744 (La.1983); Jackson, 424 So.2d at 1000. Because of the ambivalent quality of the evidence, we find it preferable to allow the trial court to reconsider the issues under the guidelines expressed herein. Scott, 355 So.2d at 237. Cf. State v. Kennedy, 438 So.2d 210 (La.1983); State v. Rodrigue, 409 So.2d 556 (La.1982); State v. Hills, 354 So.2d 186 (La.1977); State v. Simmons, 328 So.2d 149 (La.1976).
CROSS-EXAMINATION OF STEWART
Sterling assigns as error the ruling of the trial court which precluded him from playing the Deborah Sterling tape for the witness Stewart during cross-examination to refresh his memory. As indicated from the excerpt of the transcript quoted above, Stewart apparently was unable to remember parts of Deborah Sterling's statement and was unclear in his recollection of other parts. Sterling's counsel attempted to refresh his recollection from the actual tape to assist in her cross-examination. The state objected on the ground that the taped statement was not material. The trial court sustained the objection.
Hearsay evidence is testimony in court, or written evidence, of a statement *281 made out of court, the statement being offered as an assertion to the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter. State v. Tonubbee, 420 So.2d 126 (La.1982); State v. Martin, 356 So.2d 1370 (La.1978). Hearsay evidence is inadmissible except as provided by law. La.R.S. 15:434. A witness can testify only as to facts within his knowledge and may not recite facts heard by him except as provided by law. La.R.S. 15:463. An exception to these rules is that hearsay testimony is admissible at a motion to suppress to show the information which provided a police officer probable cause to make an arrest. State v. Brown, 352 So.2d 690, 694 n. 2 (La.1977); State v. Devenow, 253 La. 796, 220 So.2d 78 (1969). Whether the officer was reasonable in acting on the information is tested by other factors. State v. Smith, 392 So.2d 454, 458 n. 6 (La.1980). The best evidence of a tape recorded statement is the unaltered tape. The accurate transcription of the tape is better evidence than oral testimony based on the recollection of a witness to the statement. La.R.S. 15:436; La.R.S. 15:437; State v. Bonanno, 373 So.2d 1284 (La.1979); State v. Auzenne, 305 So.2d 507 (La.1974).
The right to cross-examine a witness is protected by the Sixth Amendment of the United States Constitution and by La. Const. of 1974, art I, § 16. State v. Vaughn, 431 So.2d 358, 370 n. 4 (La.1983) (on rehearing). As indicated above, the statement given by Deborah Sterling to the police officers is critical on the issue of probable cause to arrest. Since the state elected to meet its burden of proof by presenting the testimony of Stewart rather than using the tape recorded statement, counsel for Sterling had a right to cross-examine him about the statement. Under these circumstances, it was error for the trial court to deny the defense request to refresh the memory of Stewart with the tape recorded statement. However, when an error has occurred in an evidentiary ruling during a hearing on a motion to suppress a confession, the recent practice of the Louisiana Supreme Court has been to remand the motion for a reopened hearing to correct the error. Jackson, 424 So.2d at 1000; State v. Edwards, 375 So.2d 1365 (La.1979).

CONCLUSION
Because of the ambivalent nature of the state's evidence on the issue of probable cause to arrest and the erroneous evidentiary ruling of the trial judge, we believe that the interest of justice requires that this cause be remanded for a reopened hearing on the motion to suppress. Because we have not completed our review of other substantive contentions raised by this appeal,[3] we will retain jurisdiction of this appeal with the following directions: if the trial court finds that the confession and evidence should have been suppressed, it is directed to grant the defendant a new trial (La.C.Cr.P. art. 851[2]); the state may seek a supervisory writ to this court for our review of such adverse rulings and, in the absence of such, this appeal will be mooted; however, if the trial court reinstates its denial of the motion to suppress, it is ordered to transmit to this court its ruling and the record of the reopened hearing on the motion to suppress, so this court may complete its review of the issue under the assignments of error previously made and any further ones made as a result of the ruling at the reopened hearingas well as for us to complete our review of the remaining assignments of error raised by this appeal. Jackson, 424 So.2d at 1001. The motion to suppress the confession is remanded to the trial court for further proceedings in accordance with the views and directions expressed by this opinion. On the remand, the state has the burden to proceed, the tape recorded statement of Deborah Sterling is admissible in evidence, Doughty and Stewart may be further questioned *282 about Deborah Sterling's statement, evidence may be received about what information, if any, was provided by the grandfather, evidence may be received about what information, if any, was given by the defendant in his first interview and evidence may be received on the "totality of the circumstances" of the informant's tip. In accordance with and subject to the directions expressed by this opinion, this court otherwise retains jurisdiction of this appeal.
REMANDED.
NOTES
[1] In determining whether the ruling on a defendant's motion to suppress is correct, an appellate court is not limited to the evidence adduced at the hearing on the motion but may also consider pertinent evidence given at the trial. State v. Burkhalter, 428 So.2d 449 (La. 1983); State v. Beals, 410 So.2d 745 (La.1982); State v. Chopin, 372 So.2d 1222 (La.1979).
[2] Sterling does not contend that improper Miranda warnings were given or that the statements were involuntary.
[3] Sterling also contends that the evidence adduced at the trial is insufficient to show that he had the intent required to commit an armed robbery and that the sentence imposed is excessive.