918 So.2d 491 (2005)
STATE of Louisiana, Appellee
v.
Eric PERSLEY, Appellant.
No. 40,271-KA.
Court of Appeal of Louisiana, Second Circuit.
December 16, 2005.
*495 Kenota Pulliam Johnson, for Appellant.
Eric Persley, Pro Se.
Paul J. Carmouche, Dale G. Cox, for Appellee.
Before PEATROSS, DREW & MOORE, JJ.
PEATROSS, J.
On April 14, 2000, Rodriques Rusley[1] was shot and killed while standing outside a nightclub in downtown Shreveport, Louisiana. After a police investigation and arrest, the State charged Eric Persley ("Defendant") with the second-degree murder of Mr. Rusley. Defendant was twice tried by a jury for the offense. The first trial took place in March 2002 and resulted in a mistrial. The second trial took place in November 2003 and resulted in a conviction of Defendant for manslaughter.[2] Defendant now appeals his manslaughter conviction, asserting thirteen assignments of error. For the reasons set forth in this opinion, Defendant's conviction is affirmed and his sentence is amended and, as amended, affirmed.

FACTS
The facts illustrated herein are taken from the testimony of a myriad of witnesses in this case and were introduced as evidence at Defendant's second trial.[3] At approximately 3 a.m. on April 14, 2000, several patrons were present at Club Lacy's, a dance club on the southwest[4] corner of Spring and Texas Streets in downtown Shreveport. Among the patrons in the club that morning were Defendant and three of his friends, Calvin Mitchell, Billy Smith and Demetrius Christaw. The four had driven to Club Lacy's in Defendant's white 1997 Mercedes E-320 sedan. During the evening, Mr. Smith became involved in a heated verbal exchange and, later, in an altercation with other club patrons. As a result, the foursome were ejected from the club. The victim's girlfriend, Charlene Ward, was inside Club Lacy's and witnessed the aforementioned altercation and the ejection. Mr. Christaw[5] later testified that the four *496 men returned to the white Mercedes and he got into the rear passenger seat and watched as Defendant and Mr. Smith retrieved firearms from the vehicle.
At approximately the same time, Shreveport Police Department ("SPD") Officers Shannon Presley and Matthew Reardon, both uniformed bicycle patrol officers, were standing in front of Studio 54, another dance club, on the northeast side of the Spring/Texas Street intersection. The officers were speaking with Joseph Lacy, the owner of Club Lacy's and Studio 54.
Suddenly, the officers and Mr. Lacy heard a gunshot from the direction of Club Lacy's. The trio immediately went towards the scene. Officer Presley saw three men standing around a white Mercedes sedan, which was parked on Spring Street, south of the intersection. He then saw another man on the southwest corner of the intersection holding a handgun, positioned "in a shooter's stance." Mr. Lacy testified that he saw the man with a gun (the man across the street from the trio) fire a shot in the direction of his club door. Ms. Ward was leaving the club when the shot was fired through the door. After hearing the shot, she ran and hid in the bathroom of Club Lacy's.
As Officer Reardon was investigating several potential suspects in a stopped Camaro,[6] Officer Presley witnessed the armed man fire three shots toward the west, where a crowd of patrons had gathered.[7] Mr. Lacy later confirmed this by testifying that he saw the shooter fire at least once to the west.[8] Officer Presley then saw two of the men who had been standing next to the white Mercedes run from the scene. Mr. Christaw later testified that Mr. Smith, still armed, fled from the scene to the south on Spring Street.
Officer Presley drew his own handgun, pointed it at the gunman and loudly ordered him to drop his weapon. The gunman lowered his weapon and ran to the white Mercedes, which was running with a driver at the wheel, and got into the back seat on the driver's side. Officer Reardon followed the gunman to the white Mercedes and loudly ordered the man to stop and drop his weapon. The gunman did not comply. Officer Presley rode his bike diagonally across the intersection (to the southeast) toward the white Mercedes.[9] The driver revved the engine of the car and drove it directly at Officer Presley, while the passenger in the rear seat raised his gun toward Officer Reardon. In response, both officers began firing at the Mercedes. A shot fired by one of the officers went through the windshield and struck the driver in the face, at which time the car abruptly stopped in the right lane of Spring Street.
After the gunfire exchange, the occupants exited the white Mercedes and Mr. Christaw began attending to Mr. Mitchell, *497 who was wounded, but left after so ordered by the police.[10] Each officer stated that only two people were in the car and neither man was holding a weapon. The driver of the car was Mr. Mitchell and the back seat passenger was Defendant. Defendant was wearing a white t-shirt with grey sleeves.[11] The officers arrested both men at the scene. Officer Presley testified that the back seat passenger was the person who fired the three shots to the west.[12] At trial, Officer Reardon identified Defendant as the man who got out of the back seat of the white Mercedes.
A black Mercedes convertible was parked on the south side of Texas Street (to the west of) Club Lacy's. When the first shot was fired, Mr. Rusley and his friend, Kenneth Nicholson, were standing next to the black Mercedes talking. After that shot was fired, the pair "took cover," but reemerged shortly thereafter once they thought the incident had concluded. Mr. Nicholson described the person who fired this shot as "a guy in a little yellow shirt, short guy ... black male." After reemerging and commencing his conversation,[13] Mr. Nicholson heard "multiple shots"he said "at least four or five" and, at that time, Mr. Rusley, who had no connection to the fight at Club Lacy's, was shot once in the right side. He told Mr. Nicholson, "I think I've been hit," lost consciousness at the scene and was transported to the hospital where he died from the gunshot wound.[14] No witness reported hearing any shots coming from the crowd near Mr. Rusley. Mr. Nicholson described this shooter as a tall black male in a white t-shirt; however, he did not see where the shooter escaped to because he took cover to avoid being shot. He did not see anyone other than the first man in the yellow shirt and the second man in the white shirt shooting a gun.
Police retrieved two handguns from the white Mercedes, a .40-caliber Glock Model 22 and a 9-mm Glock Model 17. The Glock 22 was in the map pocket in the front passenger's door and the Glock 17 was on the rear driver's side floorboard. Traces run with the Bureau of Alcohol, *498 Tobacco, Firearms and Explosives ("BAT-FE") revealed that Defendant had purchased both pistols at retail gun stores.[15] The Glock 22 was loaded with P.M.C. "El Dorado" brand ammunition and a single spent .40-caliber cartridge case (the same brand) was found just outside the front door of Club Lacy's. The door to the club was perforated with a single hole and a part of a bullet jacket was found nearby. Another spent .40-caliber P.M.C. "El Dorado" cartridge case was found on the southeast side of the intersection. Numerous other spent .40-caliber cartridge cases were found in the vicinity of Defendant's white Mercedes; however, these were Winchester "Ranger Talon" brand cases which were later determined to have been fired from the officers' Glock Model 22 handguns.
Three spent 9-mm cartridge cases were recovered at the southwest corner of the intersection where Officer Presley saw the gunman firing. As no other 9-mm cartridge cases were recovered from the scene, it was determined that these cartridge cases were fired from the 9-mm Glock that was found in the back seat of Defendant's white Mercedes sedan. The coroner recovered one 9-mm bullet from Mr. Rusley's body.[16] No fingerprints were found on the weapon. When recovered, Defendant's Glock Model 17 had 14 rounds remaining in the 17-round magazine and one round in the chamber. The Glock Model 22 had 12 rounds in its 15-round magazine and one round in the chamber. No fingerprints, DNA evidence or gunpowder tests were taken which effectively linked Defendant to the victim's death.
After a trial on the merits, the jury convicted Defendant of manslaughter.[17] *499 He subsequently filed a Motion for a New Trial urging that the trial court erred by allowing the jury to view certain exhibits prior to an offer of the exhibits into evidence and that the error was compounded when, ultimately, the exhibits were not introduced into evidence. More particularly, Defendant complained of a map shown to the jury bearing a marking"E.P."which was written on it during Mr. Mitchell's trial. Defendant moved for a mistrial at the introduction of this evidence; however, the court denied his Motion. After Defendant's objection, the prosecutor agreed to remove the marking. Defendant further complained in his Motion for Mistrial that the court erred by allowing various exhibits to remain in the exhibit books published to the jurors prior to the introduction of those exhibits into evidence. On January 21, 2004, the court held a hearing on Defendant's motion. It concluded that the handling of the exhibit issues was proper and that Defendant had not been prejudiced by the aforementioned conduct.
In March 2004, Defendant filed a second Motion for New Trial based upon newly discovered evidence. Defendant alleged that a newly discovered witness, Ms. Jywone Smith,[18] would testify that it was her husband, Mr. Smith, not Defendant, who fired the fatal shot. The motion asserted, inter alia, that Ms. Smith could testify that her husband stated that he "... looked over and saw [the victim] shot and lying on the ground after he fired his weapon" and that he, Mr. Smith, "took off running because he was bleeding and threw his shirt in a trash can and went to the car and fled from the police and was never interviewed in this particular matter."[19]
Defendant filed a supplement to this second Motion for New Trial in June 2004. The Motion alleged that Mr. Smith's girlfriend, Lavitra Poole, would testify that Mr. Smith appeared at her house in Arkansas on the day of the murder and told her that he "shot a gun and killed a guy." Defendant further alleged that another witness, Antonio Phillips, would testify that Mr. Smith admitted to him that he "got into a fight at a club and that he shot a guy next to a black car." The State filed an opposition to this Motion.
On June 7, 2004, the court held a hearing on the motions for new trial. The court heard testimony from the new witnesses, as well as the testimony of two private investigators, Cecil Carter and Richard Turner.
Ms. Poole, who is the mother of Mr. Smith's child, testified that he had arrived unannounced at her home in Arkansas in April 2000 bearing what appeared to be wounds from a recent fight. She stated that Mr. Smith told her that he had been in a fight and someone had broken a bottle over his head. Mr. Smith went on to say that he shot his attacker, but he said he thought he had shot the wrong person. She admitted that Mr. Smith owned a Tec-9 pistol and a long rifle, but that he did not say what kind of gun he used in the shooting.
Mr. Phillips lived with Ms. Poole in Arkansas at the time and recalled Mr. Smith's visit in April 2000. He stated that Mr. Smith acted "real secluded and nervous *500 and scared like he had something that he didn't want everybody to know about in his heart." Mr. Phillips testified as follows:
He [Mr. Smith] said he got into a fight incident in a club and he came out and got out, snatched out a little piece out the car and had to shoot somebody and then he took off running and wind up down there. I'm like, who you shoot, man, and he said, `I don't even know the cat.' I was like, you don't even know him, what the hell happened. He said `we just got to fighting in the club' and such and such this and such and such that.... He said [the victim] was standing by a blackhe said he was running from around a black car.
[Billy Smith] did tell me what he did with [the gun he used in the shooting.]... He stuck it in the backin the left-handit was either the left or the right-hand back seat side of the car and he took off running around a corner where the incident started off.... He said he ran over some little broad house, man, and changed his clothes. I said what you do with your other clothes, he said he threw them mother fuckers. I said, where you throw them, he said, I ditched the little shirt in the dumpster cause they going to recognize me by that shirt.
Mr. Phillips said that Mr. Smith owned a 9-mm handgun. During cross-examination, Mr. Phillips began to assert his privilege against self-incrimination under the Fifth Amendment and, as a result, the court terminated his testimony early.
Ms. Smith appeared and waived her Fifth Amendment privileges with regard to her testimony about her deceased husband. She testified:
Billy, he didn't sleep that night and I had asked him why he don't sleep. Only way he sleep if he have like sleeping pills and he's drunk. So he told me that he had a fight in a club downtown, I can't remember the name of the club, and that some guys jumped on him and he ran out the club and ran to the car to get a gun and he came back and started shooting. And he seen [Rusley] laying on the ground and then he took off running and put his shirt in the trash and went to the car. When he seen the police coming he took off running and jumped in the car with some girls and paid them to take him to Lakeside.... He said he went to a crack-head that he knew and paid him to use his car to go to Arkansas where his kid's mother was.
Ms. Smith stated that she and Mr. Smith were married at the time he confessed to her in 2002. She said that Mr. Smith did not tell her what type of gun he used in the shooting or what he did with the gun.
Each of the witnesses was impeached with either evidence of their poor recollection or potential personal interest in providing the testimony. After the investigators testified about the circumstances surrounding the statements they had taken from these witnesses, the court deferred ruling until a later date so the attorneys could submit additional memoranda. Both the State and the defense filed supplemental briefs. On June 16, 2004, the court reconvened and ultimately concluded:
Nobody has heard this case as many times as I've heard it, and I just have an opinion now about the case, and my opinion is even with this testimony I don't think would necessarily change the outcome of the jury verdict; therefore, the court will deny the motion for new trial based on newly discovered evidence.
The court sentenced Defendant on December 6, 2004. At the hearing, the court stated that Defendant's conduct had created *501 a risk of death or great bodily injury to more than one person, that the offense resulted in a significant permanent injury to the victim and his family, that he had used a dangerous weapon, that he was the leader of the group that committed the crime and that he had used a firearm during the commission of the offense. The court also noted that Defendant had shown no remorse for his conduct and that Mr. Mitchell had received a life sentence for his role in the killing. The court also mentioned Defendant's lifestyle as a sentencing factor, but did not elaborate. No pre-sentence investigation was ordered. The record indicates that Defendant has no prior felony convictions. Accordingly, the court sentenced Defendant to serve 35 years imprisonment at hard labor without benefit of parole, probation or suspension of sentence. From this ruling, Defendant now appeals. For the reasons set forth herein, we affirm.

DISCUSSION

Assignment of Error 1: The evidence is insufficient to support the verdict of guilty as to Manslaughter.
Although the record does not reflect that Defendant filed a Motion for Post-Verdict Judgment of Acquittal, pursuant to La. C. Cr. P. art. 821, this court will consider sufficiency arguments in the absence of such a motion per State v. Henson, 38,820 (La.App. 2d Cir.9/22/04), 882 So.2d 670; State v. Green, 28,994 (La.App. 2d Cir.2/26/97), 691 So.2d 1273.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accord with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the elements of the offense have been proved beyond a reasonable doubt. State v. Hearold, 603 So.2d 731 (La.1992); State v. Bosley, 29,253 (La.App. 2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson, supra; State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132; State v. Murray, 36,137 (La.App. 2d Cir.8/29/02), 827 So.2d 488, writ denied, 02-2634 (La.9/5/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Robertson, 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442.
The Jackson standard, supra, is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt *502 that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App. 2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency of the evidence evaluation under Jackson, supra, and does not extend to credibility determinations made by the trier of fact. La. Const. art. 5, § 10(B); State v. Williams, 448 So.2d 753 (La.App. 2d Cir.1984). A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508, writ denied, State ex rel. Gilliam v. State, 02-3090 (La.11/14/03), 858 So.2d 422.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, 36,180 (La. App. 2d Cir.9/18/02), 828 So.2d 622, writ denied, 02-2595 (La.3/28/03), 840 So.2d 566; writ denied, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. White, 28,095 (La.App. 2d Cir.5/8/96), 674 So.2d 1018, writ denied, 96-1459 (La.11/15/96), 682 So.2d 760, writ denied, 98-0282 (La.6/26/98), 719 So.2d 1048.
In cases involving a defendant's claim that he was not the person who committed the crime, the Jackson rationale requires the state to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Powell, 27,959 (La.App. 2d Cir.4/12/96), 677 So.2d 1008, writ denied, 96-1807 (La.2/21/97), 688 So.2d 520.
A witness's failure to identify the suspect at a pre-trial lineup is not grounds to bar the in-court identification; but, rather, it affects the weight of the testimony. Evidence may be introduced to explain any discrepancy. State v. Long, 408 So.2d 1221 (La.1982); State v. Ford, 26,422 (La.App. 2d Cir.9/21/94), 643 So.2d 293; State v. Chism, 591 So.2d 383 (La.App. 2d Cir.1991). Positive identification by only one witness may be sufficient to support a defendant's conviction. State v. Davis, 27,961 (La.App. 2d Cir.4/8/96), 672 So.2d 428, writ denied, 97-0383 (La.10/31/97), 703 So.2d 12; State v. Miller, 561 So.2d 892 (La.App. 2d Cir.1990), writ denied, 566 So.2d 983 (La.1990).
Defendant argues that the State failed to prove beyond a reasonable doubt that he was the person who fired the fatal shot. He states that "[n]o evidence, either lay, expert, medical or documentary, was presented at trial to support any of the elements [of manslaughter]." Defendant argues that the record clearly indicates a lack of evidence to support his conviction under Jackson, supra.
Specifically, Defendant points out that not one of the twenty-two witnesses who testified at trial was able to identify him as the shooter in this case. In his brief, Defendant points out inconsistencies or marked flaws in the testimony of: Officer Presley; Officer Reardon; Sergeant David Kent; Mr. Christaw; Officer Tommy Rachel; Richard Beighley (a criminalist who testified); Mr. Lacy; Ms. Matlock; Mr. Nicholson; Ms. Ward and several others who testified at trial.
*503 Defendant further points out that the State did not submit any DNA, fingerprints, gun powder residue or ballistics evidence which positively identified him as the shooter. Defendant admits to owning a 9-mm handgun, but points out that the State never proved that the handgun he owned was the one used in the shooting of Mr. Rusley. More poignantly, Defendant states that no witness was able to pick him out of a photo line up of suspects. He asserts from this that evidence makes it "painfully clear" that the State's case does not stand the test of Jackson, supra.[20]
In response, the State asserts that it has adequately satisfied the standard of Jackson, supra. In brief, the State argues that the record is ripe with evidence from which the jury could, and did, find Defendant guilty of committing manslaughter beyond a reasonable doubt.
The State cites Gilliam, supra, for the position that firing a gun indiscriminately into a crowd of people constitutes the necessary intent for second degree murder under theory of transferred intent. To this end, the State notes that Officer Presley testified to witnessing Defendant fire a gun three times in the direction of the victim, to watching Defendant run to the white Mercedes and to arresting Defendant after he exited the Mercedes. It further argues that the gun retrieved from the white Mercedes was registered to Defendant and that 9-mm shell cases were found in the area from which the shooter fired which matched Defendant's gun.[21] The State corroborates the eyewitness account of Officer Presley with that of Mr. Christaw, who testified that Defendant, disgruntled after being ejected from the club, retrieved a pistol and shot towards the crowd outside Club Lacy's.
Moreover, the State argues that Defendant's attempted getaway is evidence of his consciousness of guilt. It cites State v. Bordenave, 95-2328 (La.4/26/96), 678 So.2d 19, in which the supreme court held, inter alia, that evidence of a defendant urging an armed co-perpetrator to hurry while that co-perpetrator struggled with and eventually shot the victim and took his jacket, was sufficient to establish that the defendant had specific intent to kill, as required to support an attempted second-degree murder conviction. In the case sub judice, the State urges that Defendant fled to the (running) white Mercedes in an attempt to flee the scene, and, in so doing, nearly ran over Officer Presley. It argues that this attempted (and potentially lethal) escape evidences Defendant's guilty consciousness. We agree.
Our review of the record in the case sub judice reveals a combination of physical evidence, both circumstantial and direct, and eyewitness testimony presented by the State which is sufficient to carry the burden mandated by Jackson, supra.
Mr. Rusley was killed by a bullet fired from a 9-mm weapon with a polygonally-rifled barrel. Numerous spent cartridge cases were found at the crime scene; however, only three of these were 9-mm cases. The 9-mm cases were found at the spot where Officers Presley and Reardon witnessed *504 the gunman shooting to the west, where the victim stood. Both officers later testified that the gunman refused to surrender after the shooting and fled towards the waiting white Mercedes and then attempted a getaway. After the officers forced the car to stop (by shooting the driver in the face), they arrested the car's only two occupants. The uninjured occupant of the rear seat was Defendant.
Further, Defendant's Glock Model 17 was the only 9-mm weapon recovered and was the only weapon in the back seat of the white Mercedes. This pistol was matched to the spent cartridge cases found at the scene, where the shooter stood, and that pistol had a polygonally-rifled barrel.[22] Mr. Nicholson, who was standing next to Mr. Rusley when he was shot, testified that Mr. Rusley was killed during the second instance of gunfire. Similarly, both Officers Presley and Reardon witnessed the event and both testified that the second volley of shots was fired by the shooter they saw enter the back seat of Defendant's white Mercedes.
Although some witnesses' testimony varied, sometimes markedly, with respect to the actions of Defendant and his friends, Officers Presley and Reardon were close to the shooter and to the car. Here, the jury evaluation of the evidence and witnesses led them to credit the officers' testimony over that of other witnesses, and we are of the view that their decision is fully supported by the record as a whole. Given the burden set forth by Jackson, supra, and the precedent set forth in White, supra, and Allen, supra, we cannot say that this record evidences that the jury was unreasonable in finding, beyond a reasonable doubt, that Defendant fired the fatal shot.[23] For these reasons, we reject this assignment of error.

Assignment of Error 2: The State withheld exculpatory evidence in violation of Brady.

Assignment of Error 3: The honorable trial court erred in allowing the state to call surprise witnesses without giving the defense proper notice.

Assignment of Error 4: The honorable trial court erred in failing to allow a recess or continuance on numerous occasions.
Suppression, by the prosecution, of evidence favorable to an accused upon his request for such evidence, violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); State v. Barker, 628 So.2d 168 (La.App. 2d Cir. 1993), writ denied, 93-3194 (La.3/25/94), 635 So.2d 236.
The standard of review of a ruling on a Motion for Recess is the same as the review of a Motion for a Continuance. State v. White, 389 So.2d 1300 (La.1980). The granting or denial of a Motion for Continuance or a Motion for Recess is within the sound discretion of the trial judge, and his ruling will not be disturbed on appeal absent a showing of abuse and specific prejudice. La. C. Cr. P. art. 712; State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190; State v. Gipson, 28,113 (La. App. 2d Cir.6/26/96), 677 So.2d 544, writ denied, 96-2303 (La.1/31/91), 687 So.2d 402.
*505 At the beginning of the sixth day of trial, the State provided the defense with materials related to the witnesses whom it intended to call that day, namely: Ms. Matlock, Ms. Ward and Mr. Nicholson.[24] The court afforded Defendant's attorney a brief recess to review the materials, after which he noted that the information pertaining to Ms. Ward suggested that Defendant had confessed committing the crime to her. The State responded that it had no intention to put on evidence to that effect, and, in fact, no such evidence was adduced during Ms. Ward's testimony.
Defendant complained that the State's materials contained a prior statement by Mr. Nicholson that counsel did not have time to review and investigate. In response, the State elected to defer calling Mr. Nicholson as a witness and postponed his testimony for four days. Defendant further complained about insufficient time to review the materials and a prior statement by Ms. Matlock, after which he motioned for a mistrial under La. C. Cr. P. art. 729.5. The State argued in response that it had provided Defendant's attorney with more material than the Code of Evidence required, including recordings and transcripts of witness statements and the prosecutor's notes and internal memos. The trial court denied the Motion for Mistrial based upon the prosecutor's assertion that no testimony referring to a confession by Defendant would be offered. The trial court specifically afforded Defendant the opportunity to raise his concerns at a later date should circumstances so necessitate. Defense counsel did not renew his request for a recess and the record reflects that he thoroughly cross-examined Ms. Matlock, Ms. Ward and Mr. Nicholson.
Defendant cites State v. Allen, 94-2262 (La.11/13/95), 663 So.2d 686, which held that the state's failure to provide the names of witnesses to the defense was violative of the rules of discovery and constituted reversible error. In State v. Harris, 627 So.2d 788 (La.App. 2d Cir.1993), writ denied, 93-3188 (La.3/18/94), 634 So.2d 851, this court held that, where the state's failure to comply with the rules of discovery results in prejudice to the defendant, there exists reversible error. Similarly, the Defendant points to State v. Hooker, 623 So.2d 178 (La.App. 2d Cir. 1993), in which this court stated that prejudice could consist of surprise or a showing that the undisclosed evidence would have changed the defensive strategy. From this line of precedent, Defendant states that "[t]his undisclosed evidence certainly changed the defensive strategy and prejudiced" Defendant.
Defendant also cites La. C. Cr. Pr. art. 729.5, stating that a trial court may offset the effect of later disclosure by calling a recess or granting a continuance. He points out that neither a recess, nor a continuance, was granted in this case. In State v. Winston, 327 So.2d 380 (La.1976), the supreme court held that, although a trial court is given broad discretion in determining whether or not to grant a continuance, it has a burden to insure that the defendant is not surprised by the decision of the prosecutor to go to trial without adequate notice and/or full discovery. Accordingly, Defendant argues that the court's failure to grant a recess or continuance effectively prejudiced his defense and warrants relief on appeal.
The State responds that Defendant's objection regarding Ms. Ward is meritless because the State did not elicit testimony *506 from her regarding an admission of the crime. Accordingly, she could not constitute a "surprise" and preparation for her testimony was unnecessary. Similarly, it contends that any objection to the testimony of Mr. Nicholson was obviated by the fact that the State deferred calling him as a witness for four days, an ample period during which the Defendant's attorney could have prepared. Further, the State notes that Defendant's attorney was given an opportunity to cross-examine Mr. Nicholson with the benefit of time and preparation. Finally, in brief, the State mentions that "[t]he defendant made no complaints about the witness statement of [Ms.] Matlock." In summation, the State urges that there was no violation of Defendant's state or federal Constitutional rights, nor of Brady, supra, which, if with-held, would have affected the outcome of Defendant's trial.
The State next argues that Defendant's contention that his attorney was not granted a recess in this matter is incorrect. It points out that defense counsel was given a recess to review the handwritten notes which the prosecutor provided on the sixth day of trial. It cites State v. Bertrand, 381 So.2d 489 (La.1980), for the proposition that the trial court is vested with much discretion in determining whether or not to grant recesses or continuances. It argues that the defense never motioned for a continuance, and was granted a recess; and, therefore, this assignment of error is without merit. We agree.
Our review of the case sub judice reflects that Defendant has not identified specifically what evidence the State failed to provide which would exculpate him. The strongest evidence in the materials in question appears to be an alleged confession by Defendant to Ms. Ward, an inculpatory statement which was not brought out at trial by the State.
Defendant further asserts that the three "surprise" witnesses, for whom his counsel had no time to prepare, prejudiced his case. The record reveals, however, that Ms. Matlock, Ms. Ward and Mr. Nicholson were all witnesses in the first trial and were all questioned by Defendant's attorney.[25]
The record further evidences that Defendant was afforded time, when requested, to review the witnesses' statements. Defendant was also given a recess to review notes, was given the opportunity to cross-examine the witnesses, was not burdened by Ms. Matlock (as she was not called) and was given four days to prepare for Mr. Nicholson. Considering these facts, and given the language of Bertrand, supra, and Winston, supra, we reject these assignments of error.

Assignment of Error 5: The honorable trial court erred in allowing the jury to see exhibits which were not properly placed into evidence.

Assignment of Error 6: The honorable trial court erred in failing to grant [Defendant's] motion for mistrial.
Defendant next argues that the trial court improperly handled two evidentiary matters during the course of the trial. The first matter concerns the exhibit book presented to the jury after the first witness testified. The book contained evidence which the State anticipated introducing through the testimony of its witnesses; however, at the time it was given to the jurors, no evidentiary foundation had been laid for several of the exhibits. Specifically, in his testimony, Officer Kent, a SPD crime scene officer, described the crime scene photographs and diagrams, but did not describe any other exhibits in *507 the notebook. The trial court allowed into evidence exhibit one without objection and exhibits six, seven and eight over the objection of Defendant. The court allowed the jury to have the entire notebook (over Defendant's objection); however, in so doing, the trial court instructed the jurors not to thumb through the notebook on their own, but only to open it at the direction of the court or the attorneys.
At a later time, during the testimony of Officer Presley, the State directed the jury to look at exhibit three (a firearms diagram, later admitted over objection) prior to its introduction into evidence. Upon this occurrence, Defendant objected and again requested the removal from the binder of those items which had not yet been introduced into evidence. The judge overruled Defendant's objection, but expressed a desire to avoid the problem in the future.[26]
Another problem arose with regard to exhibits four and five: the coroner's report and autopsy diagram, respectively. The printed report contained an error concerning the victim's blood alcohol level; and, as a result, the State withdrew its offer of these exhibits into evidence. Those exhibits were removed from the jury's handbooks. At the conclusion of trial, exhibit ten (a BATFE trace on the Glock Model 22) was removed from the book as well.
These various problems were raised in Defendant's first Motion for a New Trial and argued at the hearing. At that hearing, the court made the following observation:
[I] want the record to be clear that as far as this court is concerned, I have no reason to believe or have any observations to make that this jury or anybody on this particular jury violated the court's instruction to look through that book when not instructed. I've been in enough juries that I have seen them do that and we've had to caution them or pull them away, but for this particular jury I want the record to be clear. Now, that doesn't mean I'm not agreeing or adopting your position, but from the court's vantage point this jury, at least from the court's perspective and for the record, obeyed the court's instructions with respect to looking and examining the exhibits in the binders.
The second evidentiary issue surrounds the State's poster exhibits and, particularly, Exhibit 12. State's Exhibit 12 is a poster-sized (4' × 3') diagram of the intersection of Texas Street and Spring Street. Exhibit 12 was first used during the trial of Mr. Mitchell. During Mr. Mitchell's trial, witnesses made markings on this exhibit, one of which consisted of the handwritten notation "E.P." at the southwest corner of the intersection.[27]
During Defendant's trial, Exhibit 12 was initially shown to the jury during the testimony of Officer Kent and was introduced into evidence after the officer identified the diagram. Officer Kent did not know who made the markings and was not asked about the "E.P." notation. During argument, the attorneys and the trial judge discussed these poster exhibits and the fact that Exhibit 12 had handwritten markings on it from an earlier trial.
SPD Officer Presley testified after Officer Kent. During direct examination, the prosecutor questioned the officer about Exhibit 12. Officer Presley pointed out specifics on the diagram as asked by the prosecutor. The prosecutor then asked: *508 "Okay. You're pointing to an area that has the initials E.P. there?" At this point, defense counsel objected to the use of the previously marked exhibit and motioned for a mistrial. In response, the court noted its previous conversation with the attorneys, the discussion of the markings on the exhibits and that, at that time, no objection was made to the markings. Defendant's attorney persisted in his demand for a mistrial and, in addition, demanded that the exhibit be removed from evidence. The court refused Defendant's request to remove the exhibit from evidence; however, the State agreed to remove the markings from the diagram. Defendant thereafter continued argument on his Motion for Mistrial, but the trial judge once again denied his motion. The prosecutor used "white-out" to cover up the "E.P." notation and the trial continued. The court did not allow Defendant the opportunity to photograph the exhibit prior to its alteration, but pictures were ultimately taken.
From these facts, the Defendant argues that the trial judge had no way of adequately knowing whether or not the jury had looked at the evidence which was eventually removed from the trial notebooks. He further asserts that the initials "E.P." were "highly prejudicial." From this, he urges that the case should be reversed on this basis under the grounds for new trial provisions of La. C. Cr. P. art. 851.[28]
The State responds that Defendant's arguments on this assignment of error are without merit. It asserts that, in order for this court to reverse, Defendant must prove that an error occurred which made it impossible for him to receive a fair trial. It cites State v. Carmouche, 01-0405 (La.5/14/02), 872 So.2d 1020, in which the supreme court held that a trial court's ruling on a motion for mistrial lies within its sound discretion and will not be over-turned absent manifest abuse of discretion. From this, the State asserts that the marking "E.P." had nothing to do with the outcome of Defendant's trial and the trial court was correct in ruling as it did. We agree.
Our review of the record reflects no abuse of discretion by the trial judge on these evidentiary matters. All relevant evidence is admissible, except as otherwise provided by law. La. C.E. art. 402. Absent a clear abuse of discretion, the trial judge's determinations concerning relevancy and admissibility should not be overturned. State v. Vaughn, 431 So.2d 358 (La.1982).
Initially, the record indicates that the only evidence the jury might have seen prematurely was Exhibit 3, the diagram pertaining to Defendant's Glock Model 17. There is no indication, however, that he was prejudiced by this fact, as his name does not appear on the diagram. Defendant's attorney thoroughly cross-examined the witness who created this document and the jury was made well aware of its shortcomings and incomplete data fields. Given the court's findings stated for the record, the provision of the notebook to the jurors cannot in this case amount to reversible error under the proviso of Vaughn, supra, and Carmouche, supra.
Second, the poster diagram was clearly admissible and was identified as accurate by SPD Officer Kent, who testified at length about the crime scene. The markings on the exhibit made by earlier witnesses, however, were not proper for exhibit to the jury in the absence of testimony explaining them. Regardless, we are of the view that whatever prejudice might have been caused to Defendant was minimal and adequately assuaged by *509 the testimony of multiple, independent eyewitnesses who placed the shooter on the southwest corner of the intersection, i.e. directly where the "E.P." notation was apparent on the diagram. Moreover, both SPD Officers Presley and Reardon, who were closest to the shootings, put the shooter at that same location. As noted, supra, these officers also identified the shooter as the person who got into, and later got out of, the rear seat of the white Mercedes and who was subsequently identified as Defendant. For these reasons, we find that the "E.P." marking was harmless error and that these assignments of error are without merit.

Assignment of Error 7: The honorable trial court erred in failing to grant a mistrial following prejudicial statements made by the victim's father, Bobby Joe Rousley.
In brief, Defendant dedicates two pages to this issue. The State, in turn, mirrors Defendant's brevity in a two sentence response and argues that the statements at issue under this assignment of error occurred during Defendant's first trial, not the one at issue in the case sub judice. We agree.
Our review of the record reveals that this assignment of error occurred during Defendant's first trial, which concluded in a mistrial and is not pertinent to his second trial, which ended in his conviction for manslaughter. Accordingly, we find this assignment of error to be without merit.

Assignment of Error 8: The honorable trial court erroneously permitted expert testimony on A.T.F. procedures by a police officer that was not qualified.
Defendant next complains that the trial court should not have allowed SPD Detective Rod Johnson to testify regarding investigative procedures used to recover the firearms in this case. The State responds that this testimony took place during the first trial of the case. We agree.
Our review of the record in the case sub judice reflects that the testimony Defendant complains of in this assignment of error occurred during his first trial. Thus, as in Assignment of Error 7, supra, this argument is irrelevant to the verdict in Defendant's second trial. For these reasons, we reject this assignment of error.

Assignment of Error 9: The honorable trial court erroneously permitted expert testimony on the Brady Bill[29]by Gene Mock, an employee at a gun store, who lacked expertise in law.

Defendant further complains that the trial court erred in allowing witness Gene Mock to testify about the effect of the Brady Bill. The provisions of this portion of federal law were not at issue. Instead, the substance of the gun shop employee's testimony concerned the Crime Control and Law Enforcement Act of 1994 ("CCLEA"), Public Law 103-322 (enacted in September 1994) and, particularly, 18 U.S.C. § 921(a)(31) and 18 U.S.C. § 922(w),[30] which, at the time of trial, provided in part:
18 U.S.C. 921(a)(31):
The term `large capacity ammunition feeding device'
(A) means a magazine, belt, drum, feed strip, or similar device manufactured after the date of enactment of the Violent Crime Control and Law Enforcement *510 Act of 1994 that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; but
(B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.
18 U.S.C. 922(w):
(1) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.
(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on or before the date of the enactment of this subsection.
At trial, Defendant objected to the following colloquy:
Prosecutor: Back on January the 19th of the year 2000 ... what capacity magazine would have come with the nine millimeter Glock semi-automatic pistol?
Witness: They have a magazine capacity limitation established in 1994, the Federal Government under the authority of the Bureau of Alcohol, Tobacco and Firearms limited (sic) a magazine capacity to ten rounds for all newly-manufactured handguns from that day forward. I believe it was in September of '94.
Prosecutor: Was that part of the Brady Bill?
Witness: Yes.
In response to Defendant's objection, the prosecutor laid additional foundation for his questions, including a showing that Mr. Mock had to be apprised of federal firearms laws to operate a retail firearms business.
Defendant cites State v. Foret, 628 So.2d 1116 (La.1993), for the proposition that, when an objection is made, and prior to a witness being qualified as an expert, the trial court must perform a "gatekeeping" function, which followed federal guidelines-i.e., it must make a determination that the testimony presented is reliable and not personal conjecture.[31] To this end, Defendant argues that Mr. Mock's testimony was prejudicial, unnecessary and lent more weight to the State's case than was needed.
In response, the State asserts that Mr. Mock was required, by law, to be fully apprised of gun laws to perform his job. As such, it argues that he was adequately qualified to offer an opinion, pursuant to La. C.E. art. 702. We agree.
Our review of the record evidences that the discussion of the CCLEA relating to the magazine capacity of semi-automatic weapons was in no way prejudicial to Defendant. There was no suggestion that he, Defendant, violated any federal firearms laws with his purchase of the pistols.
Moreover, in our view, the only error in Mr. Mock's testimony was his reference to the "Brady Bill" rather than its proper name, the "CCLEA." Accordingly, we find that the trial court correctly decided to allow Mr. Mock's testimony based upon his experience as an employee of a retail gun store who had to be generally familiar with firearms laws in order to operate the business. For these reasons, we reject this assignment of error.

Assignment of Error 10: The honorable trial court erred in denying [Defendant's] motion for new trial based on newly discovered evidence.
Defendant next challenges the trial court's ruling on his Motion for New Trial *511 based upon the newly discovered evidence from witnesses who testified that Mr. Smith confessed to them that he, not Defendant, actually shot the victim.
La. C. Cr. P. art. 851 provides, in part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
* * *
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty....
The analysis of the Motion for New Trial in a criminal case based upon newly discovered evidence was recently considered by the supreme court in State v. Watts, 00-0602 (La.1/14/03), 835 So.2d 441. Citing State v. Talbot, 408 So.2d 861 (La.1980) (on rehearing), the supreme court stated, inter alia:
The scope of the trial judge's duty toward the motion for a new trial based upon the new evidence must be kept in mind. It was not for him to determine the guilt of [another alleged suspect] or the innocence of [the defendant]; it was not for him to weigh the new evidence as though he were a jury, determining what is true and what is false. The judge's duty was the very narrow one of ascertaining whether there was new material fit for a new jury's judgment. If so, will honest minds, capable of dealing with evidence, probably reach a different conclusion, because of the new evidence, from that of the first jury? Do the new facts raise debatable issues? Will another jury, conscious of its oath and conscientiously obedient to it, probably reach a verdict contrary to the one that was reached on a record wholly different from the present, in view of evidence recently discovered and not adducible by the defense at the time of the original trial? (Footnote omitted.)
The court in Watts, supra, further explained:
The test is objective in that the trial judge does not sit as the ultimate arbiter of the resolution of the case once the new evidence is considered, that is, the trial court does not weigh the evidence. The role of the trial court is to review the evidence constituting the State's case, not to determine the sufficiency of the evidence, but to evaluate the effect of the newly discovered evidence.
* * *
When ruling on an Article 851(3) motion, a trial judge's duty is not to weigh the new evidence as though he were a jury deciding guilt or innocence or to determine what is true or false in light of the additional information. In other words, the trial judge is not to assess the newly discovered evidence as though he were a thirteenth juror. Under Talbot the trial judge should not weigh the new evidence as if he or she were a jury deciding guilt or innocence ... but should ascertain whether there is new material fit for a new jury's judgment. The only issue is whether the result will probably be different. (Citations omitted.)
The trial court has wide discretion in ruling on a Motion for New Trial; however, if the court exercises this discretion arbitrarily and the judgment is unjust, the reviewing court should set aside the judgment *512 and order a new trial. State v. Bright, 98-0398 (La.4/11/00), 776 So.2d 1134.
Referencing La. C. Cr. P. art. 851, Defendant notes that ample newly discovered evidence has been offered in the instant case, the most pertinent of which is Mr. Smith's admission to Ms. Smith that he, not Defendant, shot Mr. Rusley. He argues that, because Mr. Smith is now deceased, "[Ms. Smith's] testimony was direct evidence that [Defendant] did not commit the crime." Defendant further argues, in brief, that the State "did not prove what gun was used to shoot [the victim], [and] no finger prints, DNA, or ballistics indicated that [Defendant] was involved in this crime." Finally, he cites State v. Hammons, 597 So.2d 990 (La.1992), which stated:
The newly discovered evidence, it if had been admitted at defendant's trial, would have tended to discredit the eyewitness testimony which was already undermined by inconsistencies and discrepancies, by lack of physical evidence, by significant alibi evidence and by the fingerprint on the adhesive tape casing handled by the robber and preserved for police examination. We therefore conclude that the newly discovered evidence probably would have changed the verdict and that defendant is entitled to a new trial on the basis of the newly discovered evidence which (on this record) would be admissible at a new trial.[32]
The State responds that Judge Emanuel denied the motion, and in so doing, noted that, even if the statement of Mr. Smith (his confession to the murder) were allowed into evidence, it still would not have changed a verdict of guilty. It cites Carmouche, supra, which held that a trial court's ruling on this issue is entitled to great weight and should not be disturbed absent a manifest abuse of discretion. In summation, it states, "Judge Emanuel's ruling was correct. This evidence would not have changed the verdict." We agree in part and disagree in part.
Our review of the record reflects that the new evidence is material to the issues at trial and was discovered after the trial and nothing suggests that the failure to discover the evidence prior to trial was due to a lack of diligence. To this extent, we agree. The remaining question, then, turns on whether the evidence would have likely produced a different verdict in the event of retrial under the guise of State v. Brisban, 00-3437 (La.2/26/02), 809 So.2d 923.
The statements of Mr. Smith would probably be admissible into evidence through the testimony of the new witnesses. La. C.E. art. 804 provides, in part:
A. Definition of unavailability. Except as otherwise provided by this Code, a declarant is "unavailable as a witness" when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court. This includes situations in which the declarant:
* * *
(4) Is unable to be present or to testify at the hearing because of death or then existing physical or mental illness, infirmity, or other sufficient cause ....
B. Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

*513 * * *
(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
There is no question that Mr. Smith was present at Club Lacy's shortly before the shooting occurred. Further, evidence corroborates Mr. Smith's testimony regarding the presence of the bloody white t-shirt in the garbage dumpster near the crime scene.[33] Nonetheless, the story is consistent with Mr. Phillips' and Ms. Smith's testimony that Mr. Smith told them that he threw his shirt into the trash or into a dumpster as he fled. Mr. Phillips[34] also stated that he knew that Mr. Smith had a 9-mm weapon, although the gun that fired the only three spent 9-mm cartridge cases belonged to Defendant. Ms. Smith stated that Mr. Smith told her that he "put his shirt in the trash and went to the car." This would be consistent with the presence of the gun in the car, as well as assuming Defendant's theory was correct.
The admissibility of Mr. Smith's statements, however, does not determine whether a new trial should be granted. Rather, the question surrounds whether the new evidence would probably lead to a different result at retrial. Given the record in its entirety, we rule that the trial court did not abuse its discretion in denying Defendant's Motion for a New Trial. Although Mr. Smith's alleged confession to the new witnesses is partially corroborated by the evidence, we find that the overwhelming weight of the evidence in the case sub judice shows that Defendant, not Mr. Smith, fired the fatal shot in this case. Three spent 9-mm cartridge cases were found at the scene and these cases matched Defendant's gun, which was found in Defendant's car on the floorboard of the seat where Defendant was sitting just moments earlier. Further, the bullet recovered from the victim's body had the characteristics of being fired from a Glock handgun with polygonal rifling like the one owned by Defendant. We note that none of the new witnesses testified that Mr. Smith carried a Glock. With the exception of the first shot, Officers Presley and Reardon witnessed every shot fired, and Mr. Nicholson testified that Mr. Rusley was shot during the second instance of gunfire. The officers did not see a third man get into or out of the car during or after the second series of shots. Accordingly, it appears that, at minimum, the evidence reflects that Defendant was a principal to the killing, and the evidence proves beyond a reasonable doubt that he was, in fact, the shooter.
The evidence is, thus, inconsistent with the theory that Mr. Smith shot Mr. Rusley, and the trial courthaving tried these facts three timesclearly recognized this in giving reasons for its ruling. For these reasons, we reject this assignment of error.

*514 Assignment of Error 11: The honorable trial court erred in imposing upon [Defendant] an excessive sentence.

Assignment of Error 12: The honorable trial court erred in denying [Defendant's] Motion to Reconsider Sentence.

Assignment of Error 13: The honorable trial court failed to adequately comply with the requirements of La. C. Cr. P. art. 894.1 in fashioning [Defendant's] punishment.
On December 6, 2004, Defendant was sentenced to serve 35 years imprisonment at hard labor without benefit of parole, probation or suspension of sentence. On December 9, 2004, Defendant filed a Motion to Reconsider Sentence, arguing that the sentence was illegal because it was excessive and "considers facts that are not proper for consideration in this matter." The trial court denied the motion without a hearing on December 13, 2004.
La. R.S. 14:31 provides in part:
B. Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years. . . .
As written, the statute contains no provision for imposing the sentence without benefit of parole, probation or suspension of sentence as the trial court did in this case. However, La. C. Cr. P. art. 893 provides that persons convicted of violent offenses listed in La. R.S. 14:2(13) are to be denied the benefit of probation and suspension of sentence. Manslaughter is a crime of violence under La. R.S. 14:2(13); thus, the court was right not to suspend Defendant's sentence and place him on probation.
The State did not seek to have Defendant sentenced under La. C. Cr. P. arts. 893.1-893.3; La. C. Cr. P. art. 893.3(E)(2). Accordingly, there is no authority for the trial court's prohibition of parole, and that portion of the sentence should be deleted. An illegal sentence may be corrected at any time by an appellate court on review. La. C. Cr. P. art. 882. Defendant will have to serve 85% of his sentence, however, because his was a crime of violence. La. R.S. 15:574.4(B).
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App. 2d Cir.6/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary, even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The important elements which should be considered are Defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Bradford, 29, 519 (La.App. 2d Cir.4/2/97), 691 So.2d 864; State v. Hudgins, 519 So.2d 400 (La.App. 2d Cir.1988), writ denied, 521 So.2d 1143 (La.1988). There is no requirement that specific matters be given any particular weight at sentencing. State v. Jones, 33,111 (La.App. 2d Cir.3/1/00), 754 So.2d 392, writ denied, 00-1467 (La.2/2/01), 783 So.2d 385.
Second, a sentence violates La. Const. art. 1, § 20, if it is grossly out of *515 proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La. 1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985); Bradford, supra.
Defendant asserts that his 35-year sentence is excessive and that the trial court erred in considering Mr. Mitchell's life sentence and his, Defendant's, "lifestyle" during sentencing. He cites State v. Jones, supra, for the proposition that important elements to be considered at sentencing include a defendant's personal history (age, family ties, marital status, health and employment); prior criminal record; seriousness of the offense and likelihood of rehabilitation. Defendant points out that no pre-sentence investigation report was requested prior to sentencing; and, had one been ordered, it is more likely than not that he would not have been given such a lengthy sentence. Accordingly, Defendant argues that his sentence should be vacated and remanded for resentencing.
The State responds that the trial judge was in the unique position of having heard this case three times and still elected to sentence Defendant to 35 yearsa sentence, which it notes, is within the statutory range. It cites Article 894.1 and argues that Defendant's actions killed one man and put many others at risk for serious injury. In summation, the State contends that Defendant's sentence was not unconstitutional and well within the province of the trial judge. We agree.
Our review of the record reflects that the trial court clearly articulated the most important factors in imposing sentence, and those factors dealt with the serious nature of this crime. This shooting occurred at a busy intersection in downtown Shreveport; and, despite the late hour, the area was crowded with people patronizing local nightlife. Defendant fired a handgun three times toward a group of people without justification and with reckless disregard for the lives of said people. Afterwards, he refused to surrender to police or drop his weapon, and, with an accomplice in tow, tried to escape from the scene. During the attempted escape, Officer Reardon, who was nearly run over by the fleeing car, saw Defendant raising his gun in his, the Officer's, direction. The reckless escape attempt was stopped by police only after an officer shot the getaway driver in the face. These factors alone justify the 35-year sentence, regardless of the trial court's consideration of other factors such as the sentence received by the accomplice or Defendant's lifestyle. Moreover, given the above, the term cannot be said to be shocking in light of the grave danger posed by Defendant's conduct. For these reasons, we reject these assignments of error.

CONCLUSION
For the reasons set forth in this opinion, the conviction is affirmed and the sentence of Defendant, Eric Persley, is amended and, as amended, is affirmed.
CONVICTION AFFIRMED; SENTENCE AMENDED AND, AS AMENDED, AFFIRMED.
NOTES
[1] This is how the victim's name is spelled on the Indictment; however, the victim's first and last names are spelled differently throughout the record.
[2] In between Defendant's two trials, Calvin Mitchell was convicted of second-degree murder for his part in this offense. This court affirmed the aforementioned murder conviction, reversing the trial court's partial grant of a post-verdict judgment of acquittal. See State v. Mitchell, 39,305 (La.App. 2d Cir.2/17/05), 894 So.2d 1240, writ denied, 05-0741 (La.6/3/05), 903 So.2d 457.
[3] Due to the factually intensive nature of this opinion, we have elected to provide an overview of the events which ultimately led to Mr. Rusley's untimely death; however, because certain factual occurrences are at issue on appeal, we will provide a brief, factual synopsis where needed at various points throughout this opinion. See, infra.
[4] Spring Street is a one-way street running approximately northwest; Texas Street is a two-way street running northeast and southwest and is perpendicular to Spring Street. For the sake of clarity, it is assumed that Spring Street runs northbound, and locations are given based on that assumption.
[5] Mr. Christaw was later convicted of conspiracy to distribute crack cocaine; however, the record does not indicate that the conviction was related to this incident. He was serving time in federal prison for that conviction at the time of this trial.
[6] Immediately following the shooting, Officer Reardon stopped a Chevy Camaro which was accelerating from Texas Street onto Spring Street, apparently trying to flee the scene. Officer Reardon quickly determined, to his satisfaction, that the occupants of the Camaro were not involved and let them go.
[7] Mr. Christaw later testified that he saw Defendant shooting to the west down Texas Street, but he, Christaw, did not see anyone get hit.
[8] Another eyewitness, Alisa Matlock, was stopped in her car at the red light on Texas Street on the east side of the intersection when she saw a person she later described as a black male wearing a white t-shirt shooting to the west.
[9] In his testimony, Mr. Christaw stated that he complied with the officers' orders to get out of the car and lie down on the ground with his head down. To the contrary, both officers testified that no one got out of the car.
[10] Mr. Christaw originally denied to police that he was in the car during the shootout, but later admitted that this was a lie.
[11] A pair of pants, a pair of shoes and what appears to be a bloodied, white t-shirt were photographed at the scene, lying on the street next to the driver's side of the white Mercedes. Another bloodied, white t-shirt was photographed lying next to the driver's door of a black Mercedes. The shirt next to the white Mercedes was probably that of Mr. Mitchell (who had been shot), and the t-shirt next to the black Mercedes was that of the victim, Mr. Rusley. Another white t-shirt with apparent bloodstains was found in a garbage dumpster about one and a half blocks to the south of the crime scene at 618 Commerce St. The victim's girlfriend testified later that she saw Mr. Smith wearing two different outfits in the club that nighta leopard skin jacket and later, a baseball or football jersey. A leopard skin jacket was found in the front passenger seat of Defendant's Mercedes.
[12] Officer Presley was not, however, able to pick Defendant out of a photo lineup, but was able to identify Defendant at trial as the shooter.
[13] Mr. Nicholson estimated the elapsed time between the first shot and the next series of shots to be about three minutes and fifteen seconds.
[14] One witness, Steven Morgan, gave a different version of the events from any other witness. He was at the Blind Tiger restaurant at the northeast corner of the intersection and claimed to see one man fire "seven to nine" rounds into the door of Club Lacy's and two other men firing multiple shots"between eleven and fifteen rounds"at a man sitting in the black Mercedes convertible. He also said that three of these men got into Defendant's white Mercedes, that one of these men then "started firing at the police officers" and that all three men eventually got out of the white Mercedes and were arrested by police.
[15] Defendant bought the Glock Model 17 on January 19, 2000, from Ron's Guns in Bossier City, Louisiana. The employee who sold Defendant the gun was Mr. Gene Mock, who testified at Defendant's trial. When the weapon was recovered from the back of the white Mercedes, it held a 17-round magazine. Mr. Mock testified, over the objection of Defendant, that a new semi-automatic pistol sold in 2000 would have come with magazines limited to a capacity of 10 rounds because of the provisions of the so-called "Brady Bill." See, infra. He also testified that full-capacity 17-round magazines manufactured prior to the enactment of the "Brady Bill" (also known as "pre-ban" magazines) were legally available for purchase at a higher cost than reduced-capacity magazines.
[16] At trial, a criminalist testified that the fatal bullet had been fired from a weapon whose barrel had polygonal rifling, like that of the Glock Model 17. The criminalist was unable to state definitively that the bullet had been fired from the recovered 9-mm Glock because, as he explained, it is "extremely" difficult to match a spent bullet to a particular polygonally-rifled barrel.
[17] La. R.S. 14:31 defines manslaughter as:

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Article 30 or 30.1.
B. Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years. However, if the victim was killed as a result of receiving a battery and was under the age of ten years, the offender shall be imprisoned at hard labor, without benefit of probation or suspension of sentence, for not less than ten years nor more than forty years.
[18] Misspelled "Jwan" in the Motion.
[19] Mr. Smith was killed by his wife, Jywone Smith, this witness, on October 28, 2002, who was subsequently convicted of second-degree murder for her acts.
[20] Defendant further cites Burks v. U.S., 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); and State v. Williams, 423 So.2d 1048 (La. 1982), stating that, when a conviction is reversed for insufficient evidence, the double jeopardy provisions of the Louisiana and United States Constitutions apply.
[21] This court notes, as mentioned, supra, that the casings found at the scene were not positively identified as having been shot from Defendant's 9-mm pistol, but, rather, that the casing could have been fired from said pistol and were found in the area that the shooter, later identified by Officers Presley and Reardon as Defendant, was standing.
[22] But see, FN 21, supra.
[23] Substantial portions of Defendant's argument in brief pertain to testimony heard at the first trial; however, for the purposes of this assignment of error, this is irrelevant, except as it was used at the second trial for impeachment purposes.
[24] The material is not identified definitively in the record as a proffer or by page number; thus, it is impossible to review the substance of the materials provided. The prosecutor and defense attorney, however, described the materials during argument.
[25] We note that Defendant had the same attorney during both trials.
[26] When the State resumed questioning, however, the prosecutor instructed the jurors to keep their notebooks closed.
[27] Notably, Defendant's attorney was not present at Mr. Mitchell's trial.
[28] Cited in full, infra.
[29] The "Brady Handgun Violence Prevention Act," enacted by Public Law 103-159 on November 30, 1993, modified several sections of Title 18 of the United States Code and provides for background checks for the sale of handguns by federal firearms licensees.
[30] This provision was repealed effective September 13, 2004.
[31] See also, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
[32] In brief, Defendant's attorney incorrectly cites this holding as arising from State v. Hudson, 361 So.2d 858 (La.1978). The proper citation falls under Hammons, supra.
[33] We note that this shirt was not positively identified as Mr. Smith's through DNA testing and, arguably, could have belonged to any-one.
[34] The record indicates that Mr. Phillips commenced asserting his Fifth Amendment privilege during cross-examination and it is not clear that he would testify at a new trial.