JOHNSON, J.,
dissents, and assigns reasons.
11 Since this case is res nova, and presents the first opportunity to give direction to trial courts on how to apply and weigh the science of deoxyribonucleic acid (DNA)[1] testing to determine factual innocence in Applications for Post Conviction Relief, I would grant defendant’s writ application. In my view, the trial court correctly decided the DNA claim raised by the defendant in his initial writ application. The majority opines that due to the trial court’s July 22, 2009, ruling, which granted defendant a new trial based on his Brady[2] claims, we need not consider the trial court’s ruling on the DNA claim, nor the action of the Court of Appeal. This case presents a critical juncture between science and law for which we are obliged to do a thoughtful examination of the requirements and remedies contemplated by Louisiana Code of Criminal Procedure Articles 926.1 [3] and 930.3(7),[4] and to give *881 [ 2meaningful guidance to the lower courts on the interpretation of these two codal articles.
Before a defendant is entitled to DNA testing under La. C. Cr. P. art. 930.3(7), a showing must be made under Article 926.1 that DNA testing will resolve doubt as to the guilt of the defendant, and establish the innocence of the defendant. Clearly, La. C. Cr. P. art. 926.1 provides for an evidentiary examination in which a defendant may introduce extrinsic evidence, not admitted into evidence at trial. Said evidence must inure to the factual innocence of the defendant, establish articuable doubt as to his guilt, and establish that DNA testing will likely resolve that doubt in favor of the defendant to invoke the right to use DNA evidence for the purpose of Post Conviction Relief.
The majority of jurisdictions in this country require a threshold showing of “materiality” before testing is granted. Materiality requires the defendant to demonstrate that “a reasonable probability exists that the defendant would not have been convicted if exculpatory results had been obtained through DNA testing.” Several states impose additional limitations after the resulting DNA testing exclude |san individual. New York State permits relief if the results of DNA testing show a reasonable probability of innocence. Pennsylvania uses the heightened,
For guidance as to the applicable standard of review, our trial court can apply already established Louisiana jurisprudence concerning Post Conviction Relief based on Brady violations. When a defendant’s application for Post Conviction Relief is based on the State’s withholding Brady material, a grant of Post Conviction Relief is warranted when a defendant establishes that it was reasonably probable that the result of the proceeding would have been different had the suppressed evidence been disclosed.[6] By analogy, when examining a claim for Post Conviction Relief based on DNA evidence, courts should weigh the evidence produced in application for DNA testing under La. C. Cr. P. art. 926.1, and the DNA results obtained under La. C. Cr. P. art. 930.3(7), against the State’s evidence to determine whether it was reasonably probable that the result of the proceeding would have been different, had the DNA evidence been available.
The clear wording of La. C. Cr. P. art. 930.3(7), states that the results from DNA testing, pursuant to an application for Post Conviction Relief, under La. C. Cr. P. art. 926.1, will prove by clear and convincing evidence that the petitioner is factually innocent of the crime for which he was convicted (the DNA in question does not match that of the petitioner). To *882 prove a matter by clear and convincing evidence means to demonstrate “the existence of the disputed fact must be highly probable, that is, much more probable than its non-existence.”[7]
La. C. Cr. P. art. 930.3(7) does not require that the DNA test results exonerate |4a defendant, or establish actual innocence.[8] The clear and convincing proof contemplated by the statute is a DNA result that excludes a defendant, after an evidentiary finding that there is a reasonable likelihood that the requested DNA testing will resolve the doubt, and establish the innocence of the defendant.
In light of the facts the defendant, Anthony Johnson, (Johnson) presented to invoke the application of DNA testing, Johnson clearly showed that there existed articulable doubt, as to his guilt, based on competent evidence, and that DNA testing would resolve that doubt and establish his factual innocence. Instead of contesting these facts that were presented by Johnson as reasons to doubt his guilt, the state conceded that DNA testing was warranted under these circumstances. There is no issue as to the credibility of the test results since the defense and the State jointly selected the laboratory that would conduct all of the DNA testing (Reliance Technologies, Inc.). Further, the state could not rebut the scientific studies, and expert testimony offered by the defendant which established that foreign DNA under fingernails is usually a result of a violent struggle or intimate conduct.[9] Against the backdrop of all the facts, and evidence presented establishing reasons to doubt the correctness of Johnson’s conviction, combined with the DNA results, the District Court correctly granted Johnson a new trial.
Since the state conceded the defendant’s right to DNA testing in the case at bar, there was no need to consider whether the defendant met his burden of proof under Article 926.1 Armed with his results, Defendant made his case at the post conviction hearing that the DNA test results resolved the doubt, and established his factual | finnocence by clear and convincing evidence.
The State’s case against Johnson hinged primarily on a police officer’s recollection of an inculpatory statement allegedly made by Johnson regarding the types of weapons used in the murder which revealed “special knowledge.[10]” The body of Angela Bond, the victim, was discovered with a knife and fork protruding from it. However, this “special knowledge” of the weap *883 ons used in the murder, was known to several people, (including Johnson’s sister) prior to law enforcement’s arrival at the murder scene. Moreover, the alleged statement was not recorded contemporaneously, but instead, documented by the police officer nearly three months after it was purportedly uttered.
The other evidence presented by the State was Johnson’s own admission that he was at the victim’s home several times on the evening prior to the murder, contradictory testimony from several witnesses regarding the times Johnson was observed in the victim’s neighborhood, and a hair found on a plastic shower cap at the crime scene that was similar to Johnson’s hair. Though similar, the hair was not conclusively determined to have originated from Johnson. The defendant’s presence in the victim’s home and the presence of his DNA, would be expected, since the victim was Johnson’s girlfriend, and they had a child together.
The evidence presented at the post conviction hearing supporting Johnson’s factual innocence is compelling for the following reasons: (1) Matthew Brown was convicted of killing two other women, Bevalina Brown and Regina Jackson. One of his murder victims was a woman he killed in the same bedroom where Angela Bond’s | (¡body was found. Brown confessed to at least two people that he killed the victim, Angela Bond,[11] (2) Two witnesses placed Matthew Brown at the victim’s home within hours of the discovery of the victim’s body, and the victim’s neighbors testified that the victim and Brown were having an affair, (3) There was un-refuted expert testimony that a struggle likely ensued between the murder victim and her attacker, (4) There was un-refuted expert testimony that the biological evidence found under the victim’s fingernails was likely transferred during the murder from the victim’s attacker,[12] (5) DNA results proved that the biological sample was from a single male donor, and that Johnson was not the contributor of the DNA material found under the fingernails of the victim, (6) Kelvin Hayes (a suspected co-perpetrator in the murders of Bevalina Brown and Regina Jackson), admitted to law enforcement that he made a statement implicating himself as having a role in the killing of Angela Bond.[13]
Johnson also re-urged testimony given at his trial by Lionel Weathersby, (a neighbor of Angela Bond) who testified that he heard two men outside his window, at about 3:30 am, on the night of the murder, and one of them said, “I killed that bitch.” Weathersby testified it was not defendant’s voice that he heard, and the car he heard drive away, was not defendant’s car.
*884 Further, Johnson’s account of his whereabouts on the evening of the murder 17are corroborated by at least two witnesses.[14] In his application for Post Conviction Relief and DNA testing, Johnson challenged the recollection of Carl McGee, one of the State’s witnesses at his trial. McGee had testified that he saw Johnson leaving the victim’s house around 6:00 a.m. the morning the victim’s body was discovered, wearing a plastic shower cap on his head. He said Johnson, waved at him while he drove past and was wearing his plastic shower cap, as he often did. However, McGee’s police statement indicated that he was outside at 6:00 a.m. because he was putting out the trash when he saw Johnson drive by, and trash day was the day before the body was discovered, which is also the time Johnson would have been driving to his job at the hospital, to which he always wore a plastic shower cap.
Lastly, Johnson highlighted the stark similarities between the murders of the three women killed in Bogalusa indicating a modus operandi All three women were young African American women in their twenties. Regina Jackson had been beaten about the head and face and throttled like Angela Bonds. Bevalina Brown and Angela Bond, were both killed in the same house and in the same bedroom. They were both strangled with fabric wrapped around their necks, and both had a second thicker piece of fabric around their necks. Both victims’ heads were turned to the right, and they both had their tongues protruding through their teeth. They both had semen in their vaginas and there was no evidence of drug or alcohol in their systems. Perhaps the strangest coincidence was that both women slept with weapons under their pillows for protection: Angela with an ice pick and fork, and Bevalina with knives.
A trial court’s grant of a motion for new trial should only be reversed upon a 1 ¿finding that the trial court abused its wide discretion.[15] In evaluating whether newly discovered evidence warrants a new trial, the test to be employed is not simply whether another trier of fact might render a different verdict, but whether the new evidence is so material that it ought to produce a verdict different from that rendered at trial. When presented with a motion for a new trial based on newly discovered evidence, the trial judge’s duty is not to weigh the new evidence as though he were a jury determining guilt or innocence; rather his duty is the narrow one of ascertaining whether there is new material fit for a new jury’s judgment.[16]
Considering the wealth of exculpatory evidence Johnson presented pursuant to La. C. Cr. P. art. 926.1, and the DNA results, this trial court judge did not abuse his discretion in ruling that Johnson had proven his factual innocence. Thus, in my view, the Court of Appeal erred in reversing the decision of the district court, and in reinstating the conviction for second degree murder.

. DNA is the fundamental blueprint in each of our cells that contain all our genetic information, from our general identity as human beings to our specific identity as an individual person. No two persons, except identical twins, have the exact same DNA. Sophisticated scientific technology has combined with molecular biology to be able to decipher this individual identity from even the most minute sample of body tissue (saliva, blood, semen, skin, hair). Every cell of our body contains the complete blueprint of all our traits. La. Prac.Crim. Trial Prac. section 20:41 (4th ed. 2008) ... [T]he length and composition of certain DNA base-pair sequences varies from one individual to another at several million sites along the human chromosome, and that, by examining the sizes of enough fragments at different sites on different chromosomes, statistical procedures based on known sequence frequencies in the population can be employed to establish the uniqueness of any one person’s DNA pattern. Am.Jur.2d. Evidence section 574.

. Brady v. State, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under Brady, the prosecution has a duty to disclose evidence favorable to a defendant, whether the evidence is exculpatory or impeachment, prior to trial.

.Article 926.1 provides in pertinent part:
An application filed under the provisions of this Article shall comply with the provisions of Article 926 of this Code and shall allege all of the following:
(1) A factual explanation of why there is an articulable doubt, based on competent evidence whether or not introduced at trial, as to the guilt of the petitioner in that DNA testing will resolve the doubt and establish the innocence of the petitioner.
... C. In addition to any other reason established by legislation or jurisprudence, and whether based on the petition and answer or after contradictory hearing, the court shall dismiss any application filed pursuant to this Article unless it finds all of the following:
(1) There is an articulable doubt based on competent evidence, whether or not introduced at trial, as to the guilt of the petitioner and there is a reasonable likelihood that the requested DNA testing will resolve the doubt and establish the innocence of the *881 petitioner. In making this finding the court shall evaluate and consider the evidentiary importance of the DNA sample to be tested. [Emphasis added]

.La. C. Cr. P. art. 930.3(7) provides in pertinent part that:
If the petitioner is in custody after a sentence for conviction of an offense, relief shall be granted only on the following grounds:
(7) The results of DNA testing performed pursuant to an application granted under more-probable-than-not, standard.[5] (Citations omitted). Article 926.1 proves by clear and convincing evidence that the petitioner is factually innocent of the crime for which he was convicted.

. 92 Minn. L.Rev. 1627, Claiming Innocence, (June 2008).

. See, State v. Kenner, 2004-1809, 900 So.2d 948 (La.App. 4 Cir.2005), writ granted, vacated 2005-1052, 917 So.2d 1081 (La. 12/16/05).

. Fernandez v. Herbert, 2006-1558, p. 9 (La.App. 1st Cir.5/4/07), 961 So.2d 404, 408.

. The actual innocence standard is employed by federal courts in determining whether a petitioner is entitled to habeas corpus relief based on constitutional claims that are procedurally barred under state law. A prisoner asserting a claim of innocence as a “gateway” to defaulted claims must establish that, in light of new evidence, it is more likely than not, that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt. House v. Bell, 547 U.S. 518, 126 S.Ct. 2064, 2068, 165 L.Ed.2d 1 (2006).

. The studies introduced into evidence reported no examples of foreign DNA from fingernails being matched to someone other than a sexual partner or assailant.

.The trial court judge, expressing his misgivings about the conviction stated:
[T]he court can very candidly tell you that in this trial until the defendant took the stand, I had some misgivings about the, the business about every reasonable hypothesis. I truly did. I considered the case that if the defendant had not taken the stand in this case and the verdict had come back that this would be a very close case, one probably where, where the court would be in the position of having to grant a judgment verdict of acquittal.

. Brown boasted that he killed Angela Bond to a cell mate, Joseph Rogers. Brown told Rogers that one of the “girls” he killed had a boyfriend in prison with him in Washington Parish for the murder that Brown committed. Additionally, William Todd Morris (Morris) testified to a grand jury that Brown bragged to him about killing a girl with a fork, and that somebody else was taking the rap for the murder. Morris testified at Johnson’s second grand Jury that Brown had confessed to killing a woman with a fork.

. The State originally suggested that the DNA from the victim's fingernail clippings could have been deposited there by a male infant the victim was caring for on the day of her murder. The State suggested, contrary to the expert testimony, that DNA is easily transferred under the fingernails from person to person.

.Two witnesses, Carlos Wayne Dunn, and Stanley Lundy, reported to police that on the day before Bevalina was found murdered, they heard Hayes threatening to rape and kill Bevalina Brown “the same way the other girl {Angela Bonds) in that house was killed.” Hayes admitted to the police that he made that statement.

.Charlotte Smith stated to the police that Johnson was at the Jug's bar that night, left with crabs and returned at least once. She recalled that he was still there when she left around 11:30 p.m. Charles Taylor told the police that Johnson was at the bar at least until 11:30 a.m. and that he left with crabs and returned several times.

. State v. Persley, 918 So.2d 491 (La.App. 2 Cir 12/16/05).

. State v. Coleman, 04-0758, (La.App. 1 Cir. 3/24/05); 918 So.2d 23